218 N.J. Super. 516 (1987)
528 A.2d 76
BROADWELL REALTY SERVICES, INC., PLAINTIFF-RESPONDENT,
v.
THE FIDELITY & CASUALTY COMPANY OF NEW YORK, DEFENDANT-APPELLANT, AND GLOBE PETROLEUM, INC., DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 12, 1987.
Decided July 2, 1987.
*518 Before Judges PRESSLER, GAULKIN and BAIME.
Harry V. Osborne, II, argued the cause for appellant (Evans, Osborne, Kreizman & Welch, attorneys; Harry V. Osborne and Charles Lee Thomason, on the brief).
Adrian I. Karp argued the cause for respondent Broadwell Realty Services, Inc.
Elmer M. Matthews, filed a brief amicus curiae for Insurance Environmental Litigation Association (Piper & Marbury, of counsel; Thomas W. Brunner, Laura A. Foggan and John W. Cavilia, on the brief).
Manta & Welge filed a brief amicus curiae for Commercial Union Insurance Company (John C. Sullivan, on the brief; Rivkin, Radler, Dunne & Bayh, of counsel; Jeffrey Silberfeld, John Rivkin and Alan S. Rutkin, on the brief).
Covington & Burling, filed a brief amici curiae for AT & T Technologies, Inc., The Boeing Company, International Business Machines Corporation, Richardson-Vicks, Inc., Stauffer Chemical Company and The Chemical Manufacturers Association (John G. Buchannan, III, Matthew L. Jacobs and John E. Hall, on the brief; Lowenstein, Sandler, Kohl, Fisher & Boylan, of counsel; Robert D. Chesler, on the brief).
The opinion of the court was delivered by BAIME, J.A.D.
This appeal presents difficult questions concerning the construction of language contained in a comprehensive general liability insurance policy. Under the policy, the insurer's obligation *519 is limited to indemnification of the insured for damage to the property of third persons. Coverage does not include damage to the insured's own property. The policy contains additional language which excludes from coverage losses caused by pollution except where the discharge, dispersal, release or escape of the contaminant is sudden and accidental. At issue is whether the cost of preventive measures taken by the insured on its own property in response to the directive of an administrative agency, which are designed to abate the continued release of pollutants on to adjacent lands, falls within the policy coverage. Auxiliary questions concern whether the gradual but unforeseen and unexpected discharge of contaminants from fissures in underground storage tanks on the insured's property and the migration of such pollutants on to the lands of third persons fall within the purview of the pollution exclusion.
The salient facts are not in dispute. On August 24, 1983, plaintiff Broadwell Realty Services, Inc. (Broadwell) received a "directive letter" from the Department of Environmental Protection (DEP) advising it that an "undetermined amount of a hazardous substance" had escaped from several underground storage tanks on its premises and had migrated on to adjacent lands. Although the property was owned by Broadwell, it had been leased to Globe Petroleum, Inc. (Globe), which operated a Citgo Service Station franchise on the premises.
The record reflects that the DEP had received several complaints concerning the presence of gasoline in two New Jersey Bell cable vaults located immediately adjacent to Broadwell's property. Based upon those reports, the DEP had retained private hydrologists whose investigation revealed that gasoline was leaking from Broadwell's property into the cable vaults and was "also discharging into a nearby stream." In their report to the DEP, the hydrologists recommended a "detailed recovery program" which, among other things, included the installation of "observation/recovery wells" across the frontage of the Citgo station to "cut off" the advance of the pollutants to *520 adjacent lands. Pursuant to the Spill Compensation and Control Act (N.J.S.A. 58:10-23.11 et seq.), the DEP directed Broadwell to take immediate "cleanup action" to stem continued migration of the hazardous substance and to remove and dispose of contaminated soil. Broadwell was further advised that failure to comply with the DEP's directive would result in treble damages and the placement of a first priority claim and lien upon all of its real and personal property.
After the gasoline leakage was confirmed by an on-site inspection, Broadwell retained an engineering company specializing in pollution control to perform the emergency recovery and cleanup operations mandated by the DEP directive. An "interceptor trench" was excavated on Broadwell's property near its boundary with the adjacent land. The trench was "backfilled" with crushed stone and a "recovery/pumping well" was installed. The trench was designed to prevent the gasoline from migrating towards the New Jersey Bell cable vaults and to facilitate the collection and removal of the hazardous substance. The cleanup and removal expenses incurred by Broadwell totalled $41,965. Apparently an additional $8,000 was expended by the New Jersey Spill Compensation Fund and this amount was also charged to Broadwell.
At the time that the gasoline leakage was discovered, Globe was insured under a comprehensive general liability policy issued by defendant Fidelity & Casualty Company of New York (Fidelity). Broadwell was named as an additional insured under the policy. The focus of the present dispute is whether expenses incurred by Broadwell in its effort to comply with the DEP's cleanup directive fell within the policy coverage. Because resolution of the issues presented by this appeal hinges upon our interpretation of language contained in the policy, we recite the relevant provisions
verbatim:
The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
A. bodily injury or

*521 B. property damage
to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.
The policy defines "property damage" as:
(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or
(2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.
"Occurrence" is defined as:
an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.
As we have noted, coverage under the policy does not include damage to the insured's own property. In that regard, the policy provides:
This insurance does not apply ... to property damages to (1) property owned or occupied by or rented to the insured, (2) property used by the insured, or (3) property in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control....
The pollution exclusion to which we referred previously reads as follows:
This insurance does not apply ... to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water, but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.
Relying upon these provisions, Fidelity disclaimed liability for the expenses incurred by Broadwell in abating the continued migration of gasoline on to the adjacent properties. The principal thrust of Fidelity's position was, and continues to be, that Broadwell's cleanup efforts in response to the DEP's directive were designed to correct and alleviate the contaminated condition *522 of its own property and, in any event, the discharge or release of the gasoline from the underground storage tanks was not "sudden and accidental."
Broadwell instituted this action seeking monetary damages and counsel fees based upon Fidelity's alleged breach of the insurance agreement. Cross-motions for summary judgment were filed. In a letter opinion, the trial judge determined that the expenses incurred by Broadwell were in furtherance of its effort "to prevent further petroleum seepage on to the property of others." The judge reasoned that Broadwell's efforts were designed to "mitigate damages" that would otherwise be owed to adjacent property owners and that the amounts expended in that regard were compensable under the policy. The judge also rejected Fidelity's argument that it had no duty to indemnify Broadwell because the loss or damage fell within the purview of the pollution exclusion. The judge found that the escape of the gasoline from the underground storage tanks was unexpected and unforeseen and was thus covered by the "sudden and accidental" exception to the exclusionary clause. Summary judgment in favor of Broadwell was accordingly entered and this appeal followed.

I
Before turning to the arguments advanced, we find it necessary to make these prefatory comments. We stated at the outset of our opinion, and we emphasize here, that the questions presented are purely ones of contractual interpretation. We stress what might otherwise appear to be obvious because all counsel, to a greater or lesser extent, have relied upon competing public policy arguments in support of their respective positions.
Of course, we recognize that resolution of the issues raised will undoubtedly have serious impact upon both the insurance industry and the consumer public. The past two decades have witnessed an explosion of litigation seeking compensation for *523 damage to the environment and injuries arising from environmental contamination. See, generally, R. Odell. Environmental Awakening, 241-251 (1st ed. 1980); Hourihan, "Insurance Coverage for Environmental Damage Claims," 15 Forum 551, 552 (1980); Soderstrom, "The Role of Insurance in Environmental Litigation," 11 Forum 762 (1976); Comment, "Compensating Hazardous Waste Victims: RCRA Insurance Regulations and a Not So `Super' Fund Act," 11 Envtl.L. 689, 690-694 (1981); Note, "The Pollution Exclusion Clause Through the Looking Glass," 74 Geo.L.J. 1237, 1238 (1986). This new breed of lawsuit has spawned collateral litigation to compel insurers to defend and indemnify polluters. Note, "The Pollution Exclusion Clause Through the Looking Glass," supra, 74 Geo.L.J. at 1239. The potential liability of defendants and their insurers is enormous.
Having said this, we underscore the limited nature of our inquiry. Whatever the relative merits of the competing public policies identified and advanced by the parties, we perceive no legal principle which would permit us to circumvent what the contract says. So it throws no light to inveigh against the "`collapse' of the pollution insurance market" allegedly caused by "judicially imposed costs of cleaning up the environment," id. at 1278-1279, or, on the other hand, to argue that protection of "blameless victims" is best served by seeking to spread the financial risk. Id. at 1237. Our role is merely to interpret the language of the insurance contract.
We are aided in that inquiry by certain well-settled principles. We are confronted here with questions pertaining to the interpretation of language contained in an extensive and complex insurance agreement. In that context, our Supreme Court has stated that while insurance policies are contractual in nature, they are not ordinary agreements but "contracts of adhesion between parties who are not equally situated." Meier v. New Jersey Life Ins. Co., 101 N.J. 597, 611 (1986). It has been said that "[c]ourts apply the adhesion doctrine because of the unequal bargaining power of the parties." Id. at 611-612. Insurance *524 contracts have thus been described as "unipartite in character." Mazzilli v. Acc. & Cas. Ins. Co. of Winterthur, 35 N.J. 1, 7 (1961). Such contracts "are prepared by the company's experts, [people] learned in the law of insurance," ibid., and therefore it is not unfair that the insurer "bear the burden of any resulting confusion." Gaunt v. John Hancock Mut. Life Ins. Co., 160 F.2d 599, 602 (2 Cir.1947), cert. den. 331 U.S. 849, 67 S.Ct. 1736, 91 L.Ed. 1858 (1947). These circumstances long ago fathered the principle that doubts as to the existence or extent of coverage must generally be resolved in favor of the insured. Mazzilli v. Acc. & Cas. Ins. Co. of Winterthur, supra, 35 N.J. at 8. See also Werner Industries Inc. v. First State Ins. Co., 217 N.J. Super. 436, 443 (App.Div. 1987); NPS Corp. v. Insurance Co. of North America, 213 N.J. Super. 547, 551 (App.Div. 1986).
Our courts "have adopted the principle giving effect to the `objectively reasonable expectations' of the insured for the purpose of rendering a `fair interpretation' of the boundaries of insurance coverage." Meier v. New Jersey Life Ins. Co., supra, 101 N.J. at 612, quoting Di Orio v. New Jersey Manufacturers Insurance Company, 79 N.J. 257, 269 (1979). See also Allen v. Metropolitan Life Ins. Co., 44 N.J. 294, 305 (1965); Kievit v. Loyal Protect. Life Ins. Co., 34 N.J. 475, 482 (1961). The insured "justifiably places heavy reliance on the knowledge and good faith of the [insurer] and its representatives and they, in turn, are under correspondingly heavy responsibility to [it]." Allen v. Metropolitan Life Ins. Co., supra, 44 N.J. at 305. Its reasonable expectations in the transaction "may not justly be frustrated and courts have properly molded their governing interpretive principles with that uppermost in mind." Ibid. Although this principle is merely one of construction, "simply an aid to the proper interpretation of terms devised by the professional underwriter," Weedo v. Stone-E-Brick, Inc., 81 N.J. 233, 246 (1979), and only genuine interpretational difficulties engage the doctrine of ambiguity, American White Cross v. Continental Ins. Co., 202 N.J. Super. 372, 381 (App.Div. *525 1985), "we have consistently construed policy [language] strictly against the insurer and where several interpretations were permissible, we have chosen the one most favorable to the [insured]." Allen v. Metropolitan Life Ins. Co., supra, 44 N.J. at 305.
With the doctrine of reasonable expectations and these principles of construction in mind, we now examine (1) whether abatement expenses incurred in response to the DEP directive are reimbursable under the policy and (2) whether the discharge or dispersal of the pollutants was "sudden and accidental," thereby falling within the purview of the exception to the pollution exclusion.

II
We first consider whether Broadwell is entitled to indemnification for the costs or expenses incurred in preventing or mitigating further damage to adjacent properties. We hold that the costs of preventive measures taken by Broadwell on its own property in response to the DEP directive which were designed to abate the continued flow of contaminants on to adjacent lands are recoverable under the policy.
Under the insurance contract, Fidelity agreed to indemnify Broadwell for "all sums which the insured shall become legally obligated to pay as damages because of property damage to which this insurance applies, caused by an occurrence." As noted by our Supreme Court in Weedo v. Stone-E-Brick, Inc., supra, "[t]his is the standard language found in the great majority of [comprehensive general liability policies] written in this country." 81 N.J. at 237. This language "set[s] forth, in fundamental terms, the general outlines of coverage, e.g., `for property damage to which this insurance applies.'" Ibid. The Court in Weedo pointed out that "[t]he qualifying phrase, `to which this insurance applies' underscores the basic notion that the premium paid by the insured does not buy coverage for all property damage but only for that type of damage provided for *526 in the policy." Ibid. Of course, Weedo involved different issues than those presented here. The Court there was concerned with whether an insurance policy covered expenses incurred by the insured, a contractor, in order to replace defective materials and repair faulty work. However, the decision in Weedo bears upon the present dispute because of the Court's careful delineation of the nature of the risks against which liability policies are designed to protect. In that regard, the Court emphasized that the coverage is for tort liability for physical damages to others and not for economic or business losses suffered by the insured. Id. at 240.
We are convinced that the expenses incurred by Broadwell to abate the continued release of contaminants on to the property of others fall within the category of coverage for which liability insurance ordinarily applies. In our view, this conclusion is fully consistent with the objectively reasonable expectations of the insured and best comports with the policy language.
Initially, we stress that Fidelity's obligation to indemnify the insured is not confined to the payment of pecuniary damages to a third party measured solely by the diminution in value of the property caused by the covered destructive incident or event. By its very terms, the policy mandates indemnification for "all sums which the insured shall become legally obligated to pay as damages because of ... property damage...." (Emphasis added). We are satisfied that Fidelity would have been obliged to indemnify Broadwell for the costs of the interceptor trenches and the observation/recovery pumping wells had they been installed on adjacent properties in order to prevent further loss to third parties. It would be folly to argue, under such circumstances, that the insured would be required to delay taking preventive measures, thereby permitting the accumulation of mountainous claims at the expense of the insurance carrier. Stated another way, the policy does not require the parties to calmly await further catastrophe. Abatement measures designed to prevent the continued destruction of adjacent property are plainly compensable under the policy. See, e.g., Chemical *527 Applications Co. v. The Home Indemnity Co., 425 F. Supp. 777, 779 (D.Mass. 1977).
So posited, the contours of the issue presented are significantly narrowed. The question becomes whether a different result is required merely because the abatement measures were taken on the insured's property rather than on adjacent lands and were in response to the DEP's directive. We consider these additional facts in inverse order.
First, the mere fact that the abatement and response expenses were incurred by Broadwell in order to comply with the DEP's directive does not, as Fidelity suggests, exclude such costs from the coverage afforded by the policy. We recognize that the insurance contract covers only payments to third persons when such individuals have a legal claim for damages against the insured on account of injury or destruction of property. We also acknowledge that the word "damages" generally refers to a pecuniary compensation or indemnity, see Black's Law Dictionary 499 (3d ed. 1933), and that the cost of complying with an injunctive decree does not ordinarily fall within this definition. See, e.g., Aetna Casualty & Surety Company v. Hanna, 224 F.2d 499, 503 (5 Cir.1955); Ladd Const. Co. v. Ins. Co. of North America, 73 Ill. App.3d 43, 47, 29 Ill.Dec. 305, 308, 391 N.E.2d 568, 571 (1979); Desrochers v. New York Cas. Co., 99 N.H. 129, 131, 106 A.2d 196, 198 (Sup.Ct. 1954). This much conceded, we are entirely satisfied that the DEP's directive which threatened to assess Broadwell an amount equal to triple the costs of the prospective cleanup operation constituted a claim for damages within the meaning of the policy language. The insured's expenditures were made to discharge its legal obligation to the DEP or, at the very least, to prevent what would have been an avoidable legal obligation to pay damages to a third party. The expenses were incurred by virtue of the in terrorem and coercive effect of the DEP's directive. The harm to the State, by reason of the discharge of pollutants into its streams, and to others was *528 continuing and ongoing. Further peril was both imminent and immediate. Under these circumstances, the abatement and response expenses constituted "damages" which Broadwell was legally obliged to pay.
Second, the fact that preventive measures were taken on the insured's property rather than on adjacent lands has no legal significance. We reject Fidelity's argument that such expenses are not reimbursable by reason of the policy language which excludes from coverage "damage to property owned or occupied by or rented to the insured," or "property in the care, custody or control of the insured." The obvious purpose of this language is to exclude from the insurer's indemnification obligation claims by the insured based upon damage or loss to its own property. We recognize that the policy is not designed to afford first party coverage. It is far different to suggest, however, that abatement remedies performed to prevent continued contamination and damage to the property of third parties fall within the exclusionary language. We again emphasize the unrefuted evidence contained in the record that contaminants were discharging into a nearby stream and into two New Jersey Bell cable vaults and that this destructive process was ongoing. Under the parens patriae doctrine, the State had a colorable claim for damage to the stream. New Jersey Bell also had a right to be compensated for whatever damage was caused by release of the gasoline from the underground storage tanks situated on Broadwell's property. We are thus convinced that abatement remedies designed to prevent imminent and immediate damage to third parties cannot be denied on the basis of the owned-property exclusion.
We stress that this does not, however, include elements of the claim which relate to remedies for damage confined to Broadwell's property. To the extent that all or a portion of the response expenses pertain solely to damage to the Broadwell site itself and not to prevent off-site contamination, the owned-property exclusion clearly applies, and such damage is not *529 within the coverage provided. We recognize that it may be extremely difficult to segregate and distinguish between cleanup expenses attributable to correcting damage to Broadwell's property, which are not recoverable, and those attributable to abatement of damage to adjacent lands, which are. We further acknowledge that the distinction between the two may to some extent become blurred. Nevertheless, we are convinced that such an allocation is necessary and best fulfills the reasonable expectations of the parties.
Although the question presented is one of first impression in New Jersey, there is no dearth of decisions in other jurisdictions. To be sure, the issue has received somewhat uneven treatment. Nevertheless, the weight of authority supports the conclusion we have reached here. Compare U.S. v. Conservation Chemical Co., 653 F. Supp. 152, 199-201 (W.D.Mo. 1986); Bankers Trust Co. v. Hartford Accident & Indem., 518 F. Supp. 371, 372-374 (S.D.N.Y. 1981), vacated, 621 F. Supp. 685 (S.D.N.Y. 1981); Harper v. Pelican Trucking Company, 176 So.2d 767, 772 (La. App.Ct. 1965); United States Aviex Co. v. Travelers Insurance Co., 125 Mich. App. 579, 589, 336 N.W.2d 838, 843 (1983); Kutsher's Country Club v. Lincoln Ins. Co., 119 Misc.2d 889, 892, 465 N.Y.S.2d 136, 139 (Sup.Ct. 1983); Leebov v. United States Fidelity & Guaranty Co., 401 Pa. 477, 481-482, 165 A.2d 82, 84-85 (Sup.Ct. 1960); Lehigh Electric v. Selected Risks Ins. Co., 30 Pa. D. & C.3d 120, 125-129 (C.P. Luzerne County Ct. 1982), and Aronson Associates v. Pa. Nat'l Casualty Ins., 14 Pa. D. & C.3d 1, 6-9 (C.P. Dauphine County Ct. 1977) aff'd mem., 272 Pa.Super. 606, 422 A.2d 689 (Super.Ct. 1979), with Mraz v. Canadian Universal Ins. Co., Ltd., 804 F.2d 1325 (4 Cir.1986); Great Lakes Container v. National Union Fire Ins., 727 F.2d 30, 33 (1 Cir.1984); Farr v. Traders & General Insurance Company, 235 Ark. 185, 188, 357 S.W.2d 544, 546 (Sup.Ct. 1962), and Prime Drilling Co. v. Standard Accident Insurance Co., 304 F.2d 221 (10 Cir.1962). See also 33 A.L.R.3d 1272 § 5 (1970). Cf. Aetna Casualty & Surety Company v. Hanna, 224 F.2d 499, 503 (5 Cir.1955); Ladd *530 Const. Co. v. Ins. Co. of North America, 73 Ill. App.3d 43, 47, 29 Ill.Dec. 305, 308, 391 N.E.2d 568, 571 (App.Ct. 1979); Desrochers v. New York Cas. Co., 99 N.H. 129, 131, 106 A.2d 196, 198 (Sup.Ct. 1954).
Unfortunately, the meager record is largely uninformative with respect to what cleanup costs were paid to correct and alleviate the contaminated condition of Broadwell's property and what expenditures were made to abate the continued seepage of gasoline on to the property of others. The matter was not briefed, argued or determined at the trial level and remains to be resolved. The question presented is clearly factual. Thus, the summary judgment remedy was inappropriate. The matter must be remanded for a plenary hearing respecting this issue.

III
We next turn to the argument advanced by Fidelity that the dispersal of gasoline from Broadwell's underground storage tanks on to adjacent properties was not "sudden and accidental" and thus came within the pollution exclusion. The principal thrust of its contention is that the word "sudden" has a temporal meaning and that the exclusionary clause thereby bars recovery for losses caused by pollution except where the damage is the result of an unexpected and instantaneous catastrophe.
We disagree. The identical argument has been considered and rejected in several reported New Jersey decisions. See Lansco, Inc. v. Dept. of Environmental Protection, 138 N.J. Super. 275, 282 (Ch.Div. 1975), aff'd 145 N.J. Super. 433 (App.Div. 1976), certif. den. 73 N.J. 57 (1977); CPS Chem. Co., Inc. v. Continental Ins. Co., 199 N.J. Super. 558, 569 (Law Div. 1984), rev'd on other grounds 203 N.J. Super. 15 (App.Div. 1985); Jackson Tp. Etc. v. Hartford Acc. & Indemn. Co., 186 N.J. Super. 156, 161 (Law Div. 1982). In these cases, our courts have construed the word "sudden" in terms of an "unexpected," *531 "unforeseen" or "fortuitous" event. This definition is consistent with the common meaning of the word in everyday parlance. See Webster's New International Dictionary (2 ed. unabridged 1954). See also Black's Law Dictionary (4 ed. 1968).
While our research discloses some degree of disarray in the decisional treatment of this issue, the reasoning expressed in Lansco, Inc. v. Dept. of Environmental Protection, supra, CPS Chem. Co., Inc. v. Continental Ins. Co., supra, and Jackson Tp. Etc. v. Hartford Acc. & Indemn. Co., supra, represents the prevailing view in other jurisdictions. Compare U.S. Fidelity & Guar. Co. v. Armstrong, 479 So.2d 1164, 1168 (Ala.Sup.Ct. 1985); Molton, Allen & Williams, Inc. v. St. Paul F. & M. Ins., 347 So.2d 95, 98-99 (Ala.Sup.Ct. 1977); Shapiro v. Public Service Mut. Ins. Co., 19 Mass. App. 648, 651-653, 477 N.E.2d 146, 149-150 (1985); Reliance Ins. Co. of Illinois v. Martin, 126 Ill. App.3d 94, 96, 81 Ill.Dec. 587, 589-590, 467 N.E.2d 287, 289-290 (1984); Travelers Indem. Co. v. Dingwell, 414 A.2d 220, 225 (Me.Sup.Jud.Ct. 1980); Allstate Ins. Co. v. Klock Oil Co., 73 A.D.2d 486, 488, 426 N.Y.S.2d 603, 604-605 (App.Div. 1980); Niagara Cty. v. Utica Mut. Ins. Co., 103 Misc.2d 814, 818, 427 N.Y.S.2d 171, 174 (Sup.Ct. 1980), aff'd, 80 A.D.2d 415, 439 N.Y.S.2d 538 (App.Div. 1981), appeal dismissed 54 N.Y.2d 608, 427 N.E.2d 1191, 443 N.Y.S.2d 1030 (1981); Buckeye Union Ins. v. Liberty Solv. & Chem., 17 Ohio App.3d 127, 128-129, 477 N.E.2d 1227, 1230 (1984), and United Pacific Ins. v. Van's Westlake Union, 34 Wash. App. 708, 714, 664 P.2d 1262, 1265-1266 (1983), with American States Ins. Co. v. Maryland Cas. Co., 587 F. Supp. 1549, 1553 (E.D.Mich. 1984); Waste Management v. Peerless Ins. Co., 315 N.C. 688, 696-697, 340 S.E.2d 374, 380-381 (1986), reh'g denied 316 N.C. 386, 346 S.E.2d 134 (1986); Transamerica Ins. Co. v. Sunnes, 77 Or. App. 136, 139-140, 711 P.2d 212, 214 (1985), review denied 301 Or. 76, 717 P.2d 631 (1986); Techalloy Co. v. Reliance Ins. Co., 338 Pa.Super. 1, 12, 487 A.2d 820, 826-827 (1984), and City of Milwaukee *532 v. Allied Smelting Corp., 117 Wis.2d 377, 384, 344 N.W.2d 523, 526-527 (App.Ct. 1983).
Through our research, we have traced the history of the "occurrence" policy definition and the pollution exclusion to the industry-wide revisions of standard general liability insurance provisions in 1966 and again in 1973. Before 1966, the standard policy covered only property damage and personal injury "caused by accident." See Hourihan, "Insurance Coverage for Environmental Damage Claims," supra, 15 Forum at 552, quoting DRI Monograph, The New Comprehensive General Liability  A Coverage Analysis 6 (Nov. 1966). Note, "The Pollution Exclusion Clause Through the Looking Glass," supra, 74 Geo.L.J. at 1241. The policy did not define the word "accident," leaving that task to the courts. The courts generally defined "accident" as "an unexpected happening without intention or design." Beacon Textiles Corp. v. Employers Mut. Liab. Ins. Co., 355 Mass. 643, 645, 246 N.E.2d 671, 673 (Sup.Jud.Ct. 1969). See also Spindler v. Universal Chain Corp., 11 N.J. 34, 38 (1952); Neylon v. Ford Motor Company, 8 N.J. 586, 588 (1952), aff'd on reargument 10 N.J. 325 (1952). Under this test, a volitional act by the insured nevertheless qualified as an "accident" if the insured did not specifically "intend to cause the resulting harm or [was] not substantially certain that such harm w[ould] occur." Quincy Mut. Fire Ins. Co. v. Abernathy, 393 Mass. 81, 84, 469 N.E.2d 797, 799 (Sup.Jud.Ct. 1984).
In the 1966 revision, the insurance industry switched universally to "occurrence-based coverage." Note, "The Pollution Exclusion Clause Through the Looking Glass," supra, 74 Geo. L.J. at 1246. This change was "in response to consumer demands for broader liability protection and in acquiescence to the judicial trend toward a more expansive reading of the term accident...." Tyler and Wilcox, "Pollution Exclusion Clauses: Problems in Interpretation and Application Under the Comprehensive General Liability Policy," 17 Idaho L.Rev. 497, 499 (1981). The standard occurrence-based policy defined an "occurrence" *533 as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." 3 Long, The Law of Liability Insurance, App.-53 (1966). This definition was designed to "make it clear that occurrence embraces not only the usual accident, but also exposure to conditions which may continue for an unmeasured period of time." Ibid.
The pollution exclusion was added by the 1973 revision. Under this exclusion, only pollution-related losses that arose from occurrences both "sudden" and "accidental" were to be covered. According to various commentators, the exclusion was designed to decrease claims for losses caused by pollution by providing an incentive to industry to improve its manufacturing and disposal processes. Soderstrom, "The Role of Insurance in Environmental Litigation," 11 Forum 762, 767-768 (1976). In other words, the insured could not "seek protection from his liability insurer if he knowingly pollute[d]" the environment. Id. at 768. Although it has been argued that the sole object of this clause was to limit coverage to accidents distinct in time and place, Note, "The Pollution Exclusion Through the Looking Glass," supra, 74 Geo. L.J. at 1242, the more reasonable conclusion is that the exclusion was designed to "eliminate coverage for damages arising out of pollution or contamination, where such damages appear to be expected or intended on the part of the insured and hence are excluded by definition of `occurrence.'" 3 Long, The Law of Liability Insurance, supra, App.-58. See also Niagara Cty. v. Utica Mut. Ins. Co., supra, 103 Misc.2d at 818, 427 N.Y.S.2d at 174; Union Pacific Ins. v. Van's Westlake Union, supra, 34 Wash. App. at 714, 664 P.2d at 1266.
There is substantial authority supporting the thesis that the pollution exclusion was intended to be coextensive with the scope of the definition of occurrence. See, e.g., Hurwitz and Kohane, "The Love Canal  Insurance Coverage for Environmental Accidents," 50 Ins. Couns. J. 378, 379 (1983); 3 Long, *534 The Law of Liability Insurance, supra, App.-58; Newman, Liability Insurance Coverage Principles, 133 (rev. ed. 1983). Citing statements made by the Insurance Service Office,[1] commentators have argued that "the limitation of coverage was intended to apply only to the intentional polluter. The pollution exclusion is [thus considered] an intentional polluter's exclusion, and, as such, [is] inapplicable to entities which neither expect nor intend their conduct to result in bodily injury or property damage." Hurwitz and Kohane, "The Love Canal  Insurance Coverage for Environmental Accidents," supra, 50 Ins. Couns. J. at 378. (Emphasis in original). Although this argument has its detractors, see, e.g., Hickman, The Pollution Exclusion Clause: A Hazardous Wasteland, in Insurance Law Conference: The Most Important Topics of the '80's B-18 (CGL Reporter's Seminar, Apr. 25-26 (1985)), most commentators "view the [policy limitation] as only a typical exclusion for intentionally caused damage by industrial or commercial dumpers...." Joest, "Will Insurance Companies Clean the Augean Stables?  Insurance Coverage for the Landfill Operator," 50 Ins. Couns. J. 258, 259 (1983).
Against this backdrop, decisional law in New Jersey and elsewhere has tended to interpret the pollution exclusion and, more particularly, the "sudden and accidental" exception, as "simply a restatement of the definition of `occurrence'  that is, that the policy will cover claims where the injury was `neither expected nor intended.'" Jackson Tp. Etc. v. Hartford Acc. & Indemn. Co., supra, 186 N.J. Super. at 164. See also Shapiro *535 v. Public Service Mut. Ins. Co., supra, 19 Mass. App. at 653, 477 N.E.2d at 150; Niagara Cty. v. Utica Mut. Ins. Co., supra, 103 Misc.2d at 818, 427 N.Y.S.2d at 174; United Pacific Ins. v. Van's Westlake Union, supra, 34 Wash. App. at 714, 664 P.2d at 1266. It is a reaffirmation that coverage will not be provided for expected and hence avoidable results.
We agree with this analysis. In our view, the pollution exclusion focuses upon the intention, expectation and foresight of the insured. If an insured knows that liability incurred by a foreseeable polluting event is covered by his policy, he is tempted to diminish his precautions and relax his vigilance. Conversely, we perceive no sound basis anchored in the policy language which requires prescience or clairvoyance on the part of the insured. Where the insured has taken reasonable precautions against contaminating the environment and the dispersal of pollutants is both accidental and unforeseen, we are of the view that the "sudden and accidental" exception to the exclusion is applicable and the loss is thereby covered by the policy.
Our construction of the exclusionary language has several benefits. By defining the word "sudden" as meaning unexpected and unintended, we avoid the question whether the focus of the exclusion is upon the release of the contaminant or the resulting permeation and damage to the environment. This issue has generated substantial debate in those jurisdictions which have construed the word "sudden" in temporal terms. Compare Waste Management v. Peerless Ins. Co., supra, 315 N.C. at 697, 340 S.E.2d at 381, with Travelers Indem. Co. v. Dingwell, supra, 414 A.2d at 224. In other words, does the word "sudden" refer to "the time necessary for the ultimate loss to manifest itself fully," see Note, "The Pollution Exclusion Through the Looking Glass," supra, 74 Geo. L.J. at 1296, or does it refer to the actual release, escape or discharge of the pollutant? If the word "sudden" is defined as "rapid" or "instantaneous," how is the exclusion to be applied to the abrupt escape of a pollutant from a fissure in a tank caused by *536 a gradual corrosive process? Mere recitation of these issues discloses the investigative and evidentiary problems which would inexorably flow from adoption of the arguments advanced by Fidelity.
More important, our interpretation of the exclusionary language best advances the objectively reasonable expectations of the insured. As we have pointed out, the pollution exclusion had its genesis in the 1973 industry-wide revision. Even when considered within the context of our litigious society, it can fairly be said that the exclusion has generated an extraordinary number of lawsuits. We have alluded previously to the disarray in the decisional treatment of this issue. The question continues to confound scholars and commentators. The critical circumstance is that the ambiguity and confusion was caused by language selected by the insurer. We necessarily consider the fact that "alternative or more precise" wording, if used, "would have put the matter beyond reasonable question." Mazzilli v. Acc. & Cas. Ins. Co. of Winterthur, supra, 35 N.J. at 7. The ambiguity thus created must be resolved against the insurer.
We thus construe the word "sudden" as meaning unexpected and unintended. Based upon our review of the meager record, we are persuaded that substantial factual questions exist as to whether the pollution exclusion, as construed, bars recovery. In our view, summary judgment should not have been granted.

IV
In its brief, Fidelity additionally contends that the "occurrence" did not take place during the policy period. This question was not resolved by the trial judge and should be addressed at the hearing on remand.
Accordingly, the summary judgment in favor of Broadwell is reversed and the matter is remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.
NOTES
[1] The Insurance Rating Board stated:

Coverage for pollution or contamination is not provided in most cases under present policies because the damages can be said to be expected or intended and thus are excluded by the definition of occurrence. The above exclusion clarifies this situation so as to avoid any questions of intent. Coverage is continued for pollution or contamination caused injuries where the pollution or contamination results from an accident....
Hurwitz and Kohane, "The Love Canal  Insurance Coverage for Environmental Accidents," supra, 50 Ins. Couns. J. at 379. (Emphasis in original).