235 N.J. Super. 321 (1989)
562 A.2d 251
STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL PROTECTION, AND THE CITY OF NEWARK, PLAINTIFFS-RESPONDENTS,
v.
SIGNO TRADING INTERNATIONAL, INC.; SCI EQUIPMENT AND TECHNOLOGY, INC.; STORAGE INNOVATIONS, INC.; VISTA INTERNATIONAL; ATLANTIC COAST ENVIRONMENTAL, INC.; RESOURCE TECHNOLOGY SERVICES, INC.; JACK COLBERT; CHARLES COLBERT, AND ROBERT MCKENNA, DEFENDANTS. MORTON SPRINGER & CO., INC., DEFENDANT AND THIRD-PARTY PLAINTIFF-RESPONDENT,
v.
FEDERAL INSURANCE COMPANY, THIRD-PARTY DEFENDANT-APPELLANT, AND SCOVILL, INC.; EASTERN WASTE INDUSTRIES, INC.; EASTERN DISPOSAL, INC., AND JOHN M. SPEAK, JR., THIRD-PARTY DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued March 14, 1989.
Decided August 2, 1989.
*322 Before Judges MICHELS, LONG and KEEFE.
William J. Brennan, III, argued the cause for appellant Federal Insurance Company (Smith, Stratton, Wise, Heher & Brennan, attorneys, William J. Brennan and Wendy L. Mager, of counsel and on the brief).
Robert G. Hoyt, Deputy Attorney General, argued the cause for respondent State of New Jersey, Department of Environmental Protection (Peter N. Perretti, Jr., Attorney General of New Jersey, attorney; Michael R. Clancy, Deputy Attorney General, of counsel; Robert G. Hoyt, on the brief).
David H. Harris argued the cause for respondent Morton Springer & Co., Inc.
Lowenstein, Sandler, Kohl, Fisher & Boylan, attorneys for amici curiae The American Petroleum Institute, The Chemical Manufacturers Association, Allied-Signal, Inc., E.I. DuPont De Nemours & Company, General Electric Company, NI Industries, Inc., Olin Corporation, Richardson-Vicks, Inc., and Rohm and Haas Company (Covington & Burling and Joanne B. Grossman, William F. Greaney and David M. Billings, of the Washington Bar, of counsel; Robert D. Chesler, on the brief).
*323 Tompkins, McGuire & Wachenfeld, attorneys for amicus curiae Insurance Environmental Litigation Association (Wiley, Rein & Fielding and Thomas W. Brunner, James M. Johnstone, Marilyn E. Kerst and Sharon Rau Dissinger, of the Washington Bar, of counsel, William B. McGuire, on the brief).
No brief was filed on behalf of respondent City of Newark.
The opinion of the court was delivered by MICHELS, P.J.A.D.
Third-party defendant Federal Insurance Company (Federal) appeals from a summary judgment of the Chancery Division entered in favor of defendant and third-party plaintiff Morton Springer & Co., Inc. (Springer), that ordered Federal to provide coverage for and a defense to claims asserted against Springer in an underlying action instituted by plaintiffs State of New Jersey, Department of Environmental Protection (DEP), and City of Newark (Newark).

I.

Factual Background and Procedural History
On April 11, 1983, in the course of extinguishing a fire at a warehouse at 140-170 Thomas Street in Newark, New Jersey, a number of firefighters incurred respiratory injuries as a result of inhaling toxic fumes. Newark Fire Department officials discovered that various hazardous substances were being illegally stored in the warehouse in an apparently unsafe manner. The DEP was called to the scene and immediately directed Springer, the owner of the warehouse, as well as various tenants to contain the waste water from the fire and to remove any fire-damaged material.
The on-scene coordinator for the DEP, Bruce Comfort (Comfort), estimated that the structure housed approximately 17,000 containers, including boxes, cylinders, bags, pails and 55-gallon *324 drums. Comfort stated in an affidavit that the containers, which were filled with hazardous materials such as "flammables, oxidizers, corrosives, poisons and explosives," had not been kept separate from one another, leading to the possibility that "chemicals could interact with each other resulting in a chemical reaction." Comfort also noted that he had observed
drums stored in a precarious manner ..., a nonoperational water based sprinkler system, water reactive chemicals stored near open windows, inadequate lighting conditions to permit safe handling of materials, exposed wiring which could spark a chemical reaction [,] a total lack of fire extinguishers in the event of an emergency [and] [p]oor building security...."
Springer, which has described itself as an "absentee landlord" that knew nothing of the storage of hazardous chemicals in the warehouse, was represented on-site for the purpose of rent collection by Ernest Klinghoffer (Klinghoffer), the owner of a company that rented four of the six buildings located at 140-170 Thomas Street. According to Comfort, Klinghoffer "had full access to all areas of 140 Thomas Street."
On or about July 18, 1983, the DEP and Newark filed a civil action against Springer, various tenants in the warehouse and other parties, seeking injunctive relief, damages, recovery of cleanup costs and penalties under various statutes and common law theories of liability. The amended complaint charged, among other things, that Springer "knew or should have known ... of the hazardous, dangerous and illegal conditions which existed at 140 Thomas Street," because of the presence at the site of its agent, Klinghoffer. The complaint further charged that the conditions at 140-170 Thomas Street "have impaired, polluted and contaminated the environment [threatening] the health and safety of persons living and/or working in proximity" to the warehouse. The complaint also asserted that defendants had allowed hazardous substances to discharge from containers onto the floor of the warehouse, from where they might "flow or runoff" into the waters of the State. The complaint referred to Comfort's affidavit, which, in addition to generally recounting the condition of the warehouse as it existed after the fire, alleged that there existed "a clear danger of *325 fire and explosion" as a result of the improper storage of the chemicals. Comfort's affidavit further stated that "[s]hould a fire occur there would be extensive ground and groundwater contamination from toxic chemicals and known carcinogens. The nature of the chemicals could also pose the risk of respiratory illness for persons living in close proximity to the warehouse and to persons engaged in firefighting."
On September 2, 1983, the Chancery Division ordered the DEP to direct the cleanup of the "perilous and dangerous conditions" that existed at the warehouse. The court's order required the defendants in the DEP's action to perform various tasks to facilitate the cleanup of the site and impressed a lien on all New Jersey real estate owned by Springer and several other defendants in the DEP's action. A second order, which was issued by the Chancery Division on January 19, 1984, required that two tenants at the warehouse, defendants Signo Trading International, Inc. (Signo), and SCI Equipment and Technology, Inc. (SCI), "remove all remaining materials from the warehouse no later than March 31, 1984," and mandated that Springer repair the elevator at the warehouse. Neither the September 1983 nor the January 1984 order was complied with. On June 7, 1984, the Chancery Division ordered the DEP to assume "exclusive possession and control" of the warehouse "for the purpose of performing a publicly funded cleanup of the facility," and assessed sanctions for noncompliance with the earlier orders totalling $2500 against Springer and $36,000 against Signo and SCI.
The cleanup eventually was completed at a cost to the Spill Compensation Fund ("Spill Fund") of approximately $3.6 million. The Spill Fund on March 13, 1986, filed a notice of first priority lien against the property at 140-170 Thomas Street in the amount of the total cleanup costs. The property at 140-170 Thomas Street was returned to Springer's control by an order dated May 8, 1987, after the trial court determined that "the Department's decontamination program at the warehouse has abated the immediate health threat presented by the hazardous *326 chemicals stored at the site and that any remaining contamination problems should be addressed under the ECRA Program...."
While the cleanup progressed, Springer filed a third-party complaint seeking a declaration that Federal was obligated under the terms of its liability insurance policies to provide coverage for and a defense to claims asserted against Springer in the DEP's action. Federal had issued to Springer a Comprehensive Liability Insurance Policy and an Umbrella Liability Policy, both of which were effective on the date of the fire. The Comprehensive Liability Policy provided coverage for liability of up to $500,000 per occurrence, and stated generally that
[t]he company will pay on behalf of the insured all sums which the insured shall become obligated to pay as damages by reason of liability to which this insurance applies, imposed by law or assumed by the insured under any written contract, for bodily injury, property damage or personal injury caused by an occurrence and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury, property damage or personal injury, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient. The company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.
The Comprehensive Liability Policy, however, excluded coverage for "bodily injury or property damage arising out of an event, the result of which was expected or intended from the standpoint of the insured," and for property damage to "property owned ... by the insured...." The policy also excluded coverage for
bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acid, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.
The Umbrella Liability Policy provided coverage for liability of up to $5 million per occurrence, and stated generally that
[i]n consideration of the payment of the required premium, the Company hereby agrees, subject to all of the terms of this policy, to pay on behalf of the *327 insured all sums, as more fully defined by the term ultimate net loss, for which the insured shall become obligated to pay by reason of liability
(a) imposed upon the insured by law or
(b) assumed under contract or agreement by the insured, arising out of personal injury, property damage or advertising liability caused by an occurrence.
Coverage was excluded for property damage to "property owned by the insured...."
"Occurrence" was defined in the Umbrella Policy as
an accident, including continuous or repeated exposure to conditions, which results in personal injury, property damage or advertising liability neither expected nor intended from the standpoint of the insured.
"Property Damage" was defined as
(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or
(2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.
On June 10, 1985, Federal moved for summary judgment dismissing the third-party complaint. In an oral decision entered on August 16, 1985, the Chancery Division granted the motion in favor of Federal, stating that it had "a very considerable body of facts which have been built up in the course of the many, many interim injunctive applications that have been dealt with by the court, and all of the facts thus far indicate that there is no off-site damage." In so ruling, the trial court reasoned as follows:
The policy in question is a standard comprehensive liability policy, and it purports to cover for bodily injury, property damage or personal injury liability arising out of an occurrence. An occurrence in the policy is defined in such a way that basically it comes down to damage inflicted upon the persons or properties of people other than the insured. That's essentially what it comes down to.
In our present case we simply do not have any damage inflicted upon a third party or the property of third parties.
* * * * * * * *
The fact is that the only damage  actual damage which has occurred in this case is damage to Morton Springer or people who stand in Morton Springer's place. There is no third party damage within the meaning of this policy or any of its concepts.

*328 There is, of course, a risk in a situation such as this that if the property were not cleaned up there could be an absolutely God-awful conflagration of some kind that could  could have inflicted extremely serious damage on people living in the neighborhood and could have killed some of them. It could have terribly polluted the property of the neighborhood belonging to other people and could have polluted public property.
There was that risk, and because there was that risk the court has ordered cleanup work which is now into the millions of dollars. But the fact that although the risk of damage to life and property of third parties was present and was a major concern in ordering this cleanup, there was no occurrence of any such damage to property or injury or death inflicted upon third parties. There simply was not an insured event occurring within the meaning of the policy.
* * * * * * * *
[A]lthough there is much to be said for reading insurance policies liberally to give coverage to people who need it and might have some reasonable expectation that coverage exists, there is in the long run not much to be said for simply turning policies inside out and standing them on their heads and making them do jobs that they were not designed to do.
This kind of an insurance policy was not designed to pay for preventive environmental damage work in the absence of any actual injury inflicted upon third parties or their property, and to simply take this policy and rework it or recast it because right now we could use this $500,000 would not just be unfair and inappropriate so far as this insurer is concerned, but it really amounts to half-baked social engineering that I think we shouldn't engage in. These policies really aren't designed to cover this kind of a situation, and they should not on a casual ad hoc basis be violently torn asunder in order to serve some make-way social policy. Just doesn't make sense.
Subsequent to the entry of summary judgment in favor of Federal, this court decided Broadwell Realty Services, Inc. v. Fidelity & Casualty Co., 218 N.J. Super. 516 (App.Div. 1987), and CPS Chemical Co., Inc. v. Continental Ins. Co., 222 N.J. Super. 175 (App.Div. 1988), each of which dealt with issues similar to those in this case. On motion for reconsideration heard on May 25, 1988, the Chancery Division on June 20, 1988, vacated the summary judgment in favor of Federal and entered a summary judgment in favor of Springer, ordering Federal to provide coverage for and a defense to claims asserted against Springer in the DEP's action. In so deciding, the trial court stated
[i]t has never been proven before me, and indeed I don't even think it's been alleged, in any way supported by significant evidence, that, in fact, there was *329 migration of the chemical pollutants off the Morton Springer property onto any adjacent properties or actually into any of the waters of the state.
* * * * * * * *
The policy, in my fundamental judgment, simply is not meant to cover. And in my view, the fair reading of the policy is to say that it is not meant to cover, to say that we have a completely new kind of indemnification problem involved, one that may very well call for insurance coverage. But it should be insurance coverage which is designed and priced to cope with this new kind of problem.
The trial court discussed at length our decision in Broadwell Realty, supra, and quoted what it believed to be the critical language from that opinion (see 218 N.J. Super. at 527). The trial court stated
[o]f course, in that quoted language, there is reference to continuing damage to adjacent property which we don't actually have in this case. But I think the fair reading of that language calls for recognition on my part that the coercive order of the Department of Environmental Protection is viewed by the Appellate Division as damages.
And also the obligation  and there is an obligation in law to avoid imminent damages to other people when there is a course of action in progress which will result probably in damages to other people.
Those kind of avoidance costs are viewed clearly by the Appellate Division in the cited language as being a kind of damage to which the insured is entitled, with respect to which the insured is entitled to indemnification under the policy.
In our case, although there had not yet been any migration, the risk is clear. And from the viewpoint of good public, state policy, it was entirely appropriate for the DEP to want the mess to be cleaned up. And it was, in my judgment, entirely proper for me, exercising the injunctive powers of the court, to support the DEP through injunctive relief in that regard.
My view was and is that that is not what these policies are designed to do. But my view also is that the Appellate Division has ruled in this reported case that this policy does cover that kind of loss.
I am obliged as a trial judge to follow the legal rulings of the Appellate Division even though I do not agree with them. And it seems to me that if this defendant insurance company and others wish relief, they'll have to get it either from the Appellate Division or from the Supreme Court.
In my judgment, the only fair reading of the Broadwell Realty case is that the Appellate Division has clearly read a policy, which is virtually identical to this, as calling for indemnification under the circumstances which presently obtain.
* * * * * * * *
I will, therefore, enter summary judgment in favor of Morton Springer, declaring that Morton Springer is entitled to indemnification with respect to at least a portion of the DEP compliance response costs, and to at least a portion *330 of the costs for avoiding damages to, potential damages which were rather imminent to adjacent properties.
Now, conceptually, the liability is there. There may be problems in apportionment. This is a very complicated cleanup. It may very well be that, in fact, some parts of what was done are attributed only to first party protection, and some are more properly attributable to preventing loss to adjacent property and to the environment in general.
There may be some factual allocations that have to be made. But it is clear at least a substantial part of what was done is coverable under the policy as it has now been authoritatively construed by the Appellate Division; and if there is, of course, a duty to provide a defense under the policy.

II.

Whether the "Owned Property" Exclusions in Springer's Liability Policies Applied to Bar Coverage?
Federal contends that the language of the contracts must control our interpretation of the liability insurance policies under review, which excluded from coverage property damage to property owned by the insured. Federal admits for the purpose of this appeal that the DEP's claim constitutes "damages," but argues that the expenses incurred are not damages "to which this insurance applies...." Federal asserts that its liability policies do not cover all legal duties owed by Springer and that the policies fail to offer coverage for prevention of harm to third parties, unless, as in Broadwell Realty, supra, a third party already has sustained damages. In short, Federal argues that the mere prevention of harm to third parties is not covered under the policies as liability to third parties by reason of property damage. In response to the argument that such a reading of the policies would create the situation where an insured would have an incentive to permit hazardous substances that have discharged upon his property to migrate off-site in order to collect from its insurer for the costs of cleanup, Federal states that such recovery would be barred under several policy provisions that exclude from coverage damages that were "expected or intended from the standpoint of the insured."
*331 On the other hand, Springer and the Amici Curiae that support its position argue that, for the purpose of determining coverage under the liability insurance policies at issue, the focus should be not on the location of the contaminants when they were cleaned up but, rather, on why remedial measures were taken. Respondents argue that Springer's liability, if any, to the DEP is covered under its liability insurance policies, where the DEP has incurred its cleanup costs pursuant to its authority to preserve the natural resources of the State and to prevent harm threatened to third persons and property of third persons.
Initially, it should be noted that the only policy language at issue is the "owned property" exclusion, which excludes coverage for property damage to property owned by the insured. As stated previously, Federal admits for the purpose of this appeal that the costs incurred by the DEP in cleaning up the warehouse at 140-170 Thomas Street constitute "damages" within the meaning of the policy. See, e.g., CPS Chemical, supra, 222 N.J. Super. at 182-183; Broadwell Realty, supra, 218 N.J. Super. at 527-528; Lansco, Inc. v. Dep't of Environmental Protection, 138 N.J. Super. 275, 283-284 (Ch.Div. 1975), aff'd o.b., 145 N.J. Super. 433 (App.Div. 1976), certif. den., 73 N.J. 57 (1977); New Castle County v. Hartford Accident & Indemnity Co., 673 F. Supp. 1359, 1365-1366 (D.Del. 1987); Gloucester Tp. v. Maryland Cas. Co., 668 F. Supp. 394, 399-400 (D.N.J. 1987); United States v. Conservation Chemical Co., 653 F. Supp. 152, 193 (W.D.Mo. 1986). But see Continental Ins. Cos. v. Northeastern Pharmaceutical & Chemical Co., Inc., 842 F.2d 977, 985-987 (8th Cir.1988); Maryland Casualty Co. v. Armco, Inc., 822 F.2d 1348, 1353-1354 (4th Cir.1987), cert. den., 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988); Verlan, Ltd. v. John L. Armitage & Co., 695 F. Supp. 950, 954-955 (N.D.Ill. 1988).[1]
*332 In interpreting the "owned property" exclusions of Federal's liability insurance policies, the language used in the insurance contracts must be interpreted in accordance with its plain and commonly understood meaning. See Killeen Trucking, Inc. v. Great American Surplus Lines Ins. Co., 211 N.J. Super. 712, 714 (App.Div. 1986); Lansco, Inc., supra, 138 N.J. Super. at 281-282. Although ambiguities in the language of an insurance contract are to be resolved in favor of the insured, Meier v. N.J. Life Ins. Co., 101 N.J. 597, 612-613 (1986), in cases in which the terms of a policy are clear, it is a court's duty to enforce the contract as written, Kampf v. Franklin Life Ins. Co., 33 N.J. 36, 43 (1960), so as to fulfill the objectively reasonable expectations of the parties to the contract. Werner Industries, Inc. v. First State Ins. Co., 112 N.J. 30, 35-36 (1988); Rao v. Universal Underwriters Ins. Co., 228 N.J. Super. 396, 411-412 (App.Div. 1988); Amer. Home Assurance Co. v. Hartford Ins. Co., 190 N.J. Super. 477, 484 (App.Div. 1983).
Notwithstanding the "highly significant policy considerations" raised by the issues under review, see Diamond Shamrock Chemicals Co. v. Aetna Casualty & Surety Co., 231 *333 N.J. Super. 1, 15 (App.Div. 1989),[2] there exists no legal principle that would permit this court to ignore or circumvent the clear language of the insurance contracts. See Summit Associates, Inc. v. Liberty Mutual Fire Ins. Co., 229 N.J. Super. 56, 63-64 (App.Div. 1988); Broadwell Realty, supra, 218 N.J. Super. at *334 522-523; Tomaiuoli v. United States Fidelity & Guaranty Co., 75 N.J. Super. 192, 201 (App.Div. 1962).
Here, the liability policies in effect at the time of the fire clearly and specifically excluded from coverage property damage to property owned by the insured. The only property damaged by the fire and the resulting discharge of hazardous substances was property owned by Springer, the insured. In this regard, the trial court held that Springer's potential liability was covered under the policies despite that
[i]t has never been proven before me and indeed I don't even think it's been alleged, in any way supported by significant evidence, that, in fact, there was migration of the chemical pollutants off the Morton Springer property onto any adjacent properties or actually into any of the waters of the state.
Pursuant to the provisions of the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 et seq., the DEP was legally authorized to remedy the contamination at 140-170 Thomas Street, and Springer is potentially liable to the DEP for the costs of that cleanup. Springer's underlying liability insurance policy with Federal, however, covers only "damages by reason of liability to which this insurance applies...." As our Supreme Court has stated, "[t]he qualifying phrase, `to which this insurance applies' underscores the basic notion that the premium paid by the insured does not buy coverage for all property damage but only for that type of damage provided for in the policy." Weedo v. Stone-E-Brick, Inc., 81 N.J. 233, 237 (1979).
The "owned property" exclusions of the liability policies at issue clearly state that the policies do not cover damage to Springer's property and, therefore, the costs of the DEP's cleanup of Springer's property are not recoverable from Federal under the insurance contracts. Moreover, that the DEP stepped in and remedied the contamination problem does not render these costs recoverable under the liability policies. These costs are the legal responsibility of Springer and, in a broad sense, constitute damage to property owned by Springer  the named insured.
*335 In Broadwell Realty, supra, 218 N.J. Super. at 528-529, and in CPS Chemical, supra, 222 N.J. Super. at 187, we held that an insured was entitled to be indemnified by its liability insurer for the DEP's costs in remedying contamination on the insured's property, to the extent that the expenditures were necessary to protect property not owned by the insured. In both Broadwell Realty and CPS Chemical, however, pollutants had escaped from the insured's property and had caused injury to the property of third parties. "There is no novelty to the proposition that in a conventional tort action, once some present injury has been proved, the plaintiff's damages may include the cost of measures intended to prevent future injury." Diamond Shamrock, supra, 231 N.J. Super. at 12. Here, unlike in Broadwell Realty and CPS Chemical, no off-site migration of contaminants has been proven and, considering the passage of time involved, it is inconceivable that such a claim could be made.
In Summit Associates, supra, we interpreted a liability insurance policy similar to the one under review to mean that coverage could be triggered despite a lack of proof regarding damage to third parties. According to Summit Associates, the "owned property" exclusion of a liability insurance policy does not bar coverage for costs associated with the cleanup of an insured's property, despite the absence of third party damage, if "the threatened damage to third party property was immediate and imminent" and if "non-application of the owned property exclusion would best carry out the reasonable expectations of the parties." 229 N.J. Super. at 64-66. Here, however, the threat of off-site contamination was not shown to be either "immediate" or "imminent." That 14 months elapsed between the fire and the time that the DEP received the authority to commence the cleanup of Springer's property, without any proof of damage to property of third parties during that period of time, can show only that the threatened harm to third parties was, at best, "undefined and speculative" and, consequently, *336 excluded from coverage. Summit Associates, supra, 229 N.J. Super. at 66.
As a result, the "owned property" exclusions in Springer's liability insurance policies apply to bar coverage in this instance, where no off-site contamination has occurred and there has been no proof that threatened harm to third parties was either "immediate" or "imminent." Such an interpretation, although certainly burdensome to Springer, comports with the general understanding that liability insurance policies cover only tort liability for damage to others, not first party losses of the insured itself. See CPS Chemical, supra, 222 N.J. Super. at 186; McNeilab, Inc. v. North River Ins. Co., 645 F. Supp. 525, 537-539 (D.N.J. 1986), aff'd, 831 F.2d 287 (3d Cir.1987). We believe that this interpretation most nearly satisfies the reasonable expectations held by the parties upon entering into the contracts, regarding the limitations of coverage.
Thus, we hold that the trial court erred in declaring that Federal was obligated under its liability insurance policies to indemnify Springer for its potential liability to the DEP for the cost of the cleanup of Springer's property.

III.

Whether Federal Had a Duty To Defend Springer in the Underlying Action
Federal contends that the trial court erred in holding that it had a duty to defend Springer in the DEP's action. We agree. An insurer's duty to defend arises when the underlying complaint states a claim constituting a risk within the policy coverage. See Hartford Accident & Indemnity Co. v. Aetna Life & Casualty Ins. Co., 98 N.J. 18, 22 (1984); Burd v. Sussex Mutual Ins. Co., 56 N.J. 383, 388 (1970); Danek v. Hommer, 28 N.J. Super. 68, 77 (App.Div. 1953), aff'd o.b., 15 N.J. 573 (1954). Since we are satisfied that the "owned property" exclusion barred coverage for Springer for any potential liability to the *337 DEP, Federal is under no obligation to defend Springer in the underlying action.

IV.
Accordingly, the June 20, 1988, summary judgment entered in favor of Springer is reversed and judgment is entered in favor of Federal declaring that Federal is under no obligation to indemnify or defend Springer for its potential liability to the DEP for the cost of the cleanup of Springer's property.
NOTES
[1] It also should be noted that this appeal does not address whether coverage existed for the cost of fines and penalties assessed against Springer by the DEP. Nonetheless, it would appear that such costs are not recoverable under Federal's insurance policies. See Gloucester Tp. v. Maryland Cas. Co., 668 F. Supp. 394, 401-402 (D.N.J. 1987).

Furthermore, this appeal does not concern any of the clauses in the policies that require that, to be covered under the policies, the result of an event not be "expected or intended" from the standpoint of the insured. Included among these provisions are (1) the exclusion for "property damage arising out of an event, the result of which was expected or intended from the standpoint of the insured"; (2) the limitation that property damage be caused by an "occurrence," which is defined as an "accident ... neither expected nor intended from the standpoint of the insured," and (3) the "pollution exclusion," which excludes coverage for damage resulting from a discharge of pollutants, unless the discharge was "sudden and accidental." See Broadwell Realty Services, Inc. v. Fidelity & Casualty Co., 218 N.J. Super 516, 534-535 (App.Div. 1987) (interpreting the "sudden and accidental" exception to the pollution exclusion as a restatement of the definition of "occurrence," that is, that the policy covers only claims where the injury was "neither expected nor intended.")
[2] Most of the policy arguments advanced by advocates on both sides of this issue can be used to support either side of the debate. This point was illustrated in State v. Mauthe, 142 Wis.2d 620, 419 N.W.2d 279 (1987), review den., 143 Wis.2d 911, 912, 422 N.W.2d 860, 861 (1988), where the Wisconsin Court of Appeals held that the pollution exclusion in a liability policy applied to exclude from coverage damages that occurred over a period of time due to repeated leaks, because the term "sudden and accidental" did not apply to a gradual process. The court in Mauthe stated

[w]e also recognize the significant impact that this issue has on the citizens of Wisconsin. There are those who argue that public policy dictates that we construe these insurance contracts in favor of coverage. The advocates of this position point out that the social cost of repairing pollution damage is beyond the means of many companies, and without insurance coverage the enormous financial burden of cleanup falls upon the public. Tyler and Wilcox, Pollution Exclusion Clause: Problems in Interpretation and Application Under the Comprehensive General Liability Policy, 17 Idaho L.Rev. 497 (1981). Insurance should cover these significant financial risks because the risk is then spread among the various industries operating within the state. See generally Hurwitz and Kohane, The Love Canal  Insurance Coverage for Environmental Accidents, 50 Ins. Couns.J. 378 (1983).
Others argue that the use of insurance to protect industry from such costs acts as a disincentive for companies to meet their responsibility to the environment. The existence of insurance removes accountability from companies for their conduct because the costs for repairing such environmental damage does not fall directly on the company. Therefore, the surest way to avoid environmental pollution damage is to hold each company financially responsible for the consequences of its acts. See generally Soderstrom, The Role of Insurance in Environmental Litigation, 11 Forum 762, 767-68 (1976).
Proponents of this position generally object to public policy considerations influencing the construction of contract language. They contend that finding coverage from such language is a perversion of the policy's clear language, violates the obvious intent of the companies drafting the insurance contract, and represents judicial activism at its worst. See Note, The Pollution Exclusion Clause Through the Looking Glass, 74 Geo.L.J. 1237, 1251-81 (1986). [142 Wis.2d at 628, 419 N.W.2d at 282.]