NO. 5-96-0130

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_________________________________________________________________

ST. PAUL FIRE & MARINE INSURANCE COMPANY )  Appeal from the  

and ST. PAUL MERCURY INSURANCE COMPANY,  )  Circuit Court of 

                                         )  St. Clair County.

     Plaintiffs and Counterdefendants-   )

     Appellees,                          )

                                         )

v.                                       )  No. 88-MR-143

                                         )

LEFTON IRON & METAL COMPANY, INC.,       )

and LEFTON LAND & DEVELOPMENT COMPANY,   )

                                         )

     Defendants and Counterplaintiffs and)

     Third-Party Plaintiffs-Appellants,  )  

                                         )

v.                                       )

                                         )

TRANSPORTATION INSURANCE COMPANY,        )

COMMERCIAL UNION INSURANCE COMPANY,      )

CONTINENTAL CASUALTY COMPANY, GENERAL    )

ACCIDENT INSURANCE COMPANY OF AMERICA,   )

NATIONAL UNION FIRE INSURANCE COMPANY OF )

PITTSBURGH, PA, RANGER INSURANCE COMPANY,)

and SAFETY NATIONAL CASUALTY CORPORATION,)  Honorable 

                                         )  Richard A. Aguirre,

     Third-Party Defendants-Appellees.   )  Judge, presiding.

_________________________________________________________________

JUSTICE GOLDENHERSH delivered the opinion of the court:

The instant appeal involves a coverage dispute between defendants/counterplaintiffs/third-party plaintiffs, Lefton Iron & Metal Company, Inc. (Lefton Iron), and Lefton Land Development, Inc. (Lefton Land) (collectively referred to as Lefton), and its primary insurance carrier, plaintiff/counterdefendant, St. Paul Fire & Marine Insurance Company and St. Paul Mercury Insurance Company (collectively referred to as St. Paul), along with third-party defendants, excess insurance carriers, Commer­cial Union Insurance Company (Commer­cial), Ranger Insur­ance Company (Rang­er), National Union Fire Insurance Company of Pittsburgh, PA (National Union), Continental Casualty Company (Continental), Transportation Insurance Company (Transpor­tation), General Acci­dent Insurance Company of America (General Accident), and Safety National Insurance Company (Safety Nation­al).  St. Paul filed a declaratory judgment action in the circuit court of St. Clair County, seeking a determination that it had no duty to defend Lefton in litigation  based on claims of alleged chemical contamination on and under a 42-acre indus­trial site owned by Lefton Land.  Lefton Iron purchased the site in 1973 and transferred ownership to Lefton Land in 1984.  The other insurers were joined by Lefton, which is seeking coverage from the insur­ers for claims during each insurer's respective policy period of either primary or excess coverage during the years 1973 through 1986.  St. Paul filed a motion for summary judgment, in which the other insurers ultimately joined.  The trial court granted summary judgment, finding that as a matter of law the insurers had no duty to defendant Lefton because the known-loss doctrine precluded Lefton from insuring its liability for the claims asserted against it.  The trial court also ruled as a matter of law that St. Paul and Safety National, the excess insurance carrier over St. Paul, had no duty to defend pursuant to the pollution-exclusion clauses of their policies.  On appeal, Lefton contends that (1) the trial court erred in applying the known-loss doctrine to the facts of this case, (2) the trial court erred in finding that no genuine issue of material fact existed as to Lefton's knowledge of the claims for which it seeks cover­age at the time it purchased the insurance policies at issue herein, (3) the trial court erred in finding that evidence submitted by Lefton does not create a disputed issue of fact as to Lefton's knowledge as relevant to the known-loss issue, and (4) the chemical contamina­tion alleged in the underlying complaint constituted a "sudden accident involving pollutants" within the written excep­tion to the pollution-exclusion clause, thereby making summary judgment in favor of St. Paul and Safety National inappropriate.  We reverse and remand with directions.

I.  FACTS

From 1927 through 1969, the site in question was used for wood-treatment operations involving the use of various chemical preservatives, including creosote, creosote solutions, and pentachlorophenol (PCP).  On January 18, 1973, Lefton Iron purchased the 42-acre industrial site in question from Moss-American, Inc. (Moss-American), the predecessor in interest of Kerr-McGee Chemi­cal Corpo­ration (Kerr-McGee), neither of which take any part in this action.  Moss-American and Kerr-McGee merged in 1974.  Lefton Iron con­veyed the site to Lefton Land on October 31, 1984, by quitclaim deed.  The property was original­ly purchased by Lefton Iron with the inten­tion of moving its scrap metal opera­tions to that site, but Lefton Iron decided to keep its scrap metal site where it was.  It is undisputed that neither Lefton Land nor Lefton Iron ever utilized any hazardous substance at the site.  Lefton never conducted any type of business on the site.  The purchase in 1973 was on an "as is" basis.  Lefton Iron was "aware of the existence of two waste water ponds containing oil and other wood preservatives in solution."  Moreover, Lefton Iron expressly agreed to indemnify and to defend and hold harm­less Moss-American. 

[Nonpublishable under Supreme Court Rule 23 omitted.]
  

On June 8, 1981, Kerr-McGee, as past owner of the site, filed a "Notification of Hazardous Waste Site" with the United States Environmental Protection Agency pursuant to section 103(c) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, also known as the Superfund Act (the Act) (42 U.S.C.A. §9603(c) (West 1995)).  On June 23, 1983, Ecology and Environmental, Inc., filed a prelim­i­nary assessment of the site on behalf of the United States Environmen­tal Protection Agency.  The assess­ment concluded that there were 11,518 cubic yards of persistent sludge at the site, containing creosote, polynuclear aromatic hydrocar­bons, and soluble phenolic materials.  The assessment warned of several 
potential
 hazards but made few explicit findings as to pollu­tion at the site.  On March 7, 1984, repre­sentatives of the Environmental Protection Agency inspected the site and took samples from two ponds on the property.  An analy­sis of the samples showed "definite contamina­tion of the two on-site ponds and a waste pile [with] a high concentration of organics."  The report went on to state, "[T]his site is definitely a candidate site for the installation of ground water monitoring wells."  Lefton admits to receiving a copy of this report in late August or early September 1985.  The site was placed on the state remedial action priorities list.  On September 26, 1985, Lefton was notified that the site had been placed on the list and that the site would be monitored further.  

On November 5, 1985, the Attorney General of Illinois sent  Benjamin Lefton a letter regarding the environmental violations at the site, mainly due to creosote and creosote wastes.  The letter explained that a multicount complaint alleging numerous violations of the Illinois Environ­mental Protection Act (Ill. Rev. Stat. 1985, ch. 111½, par. 1001 
et seq.
 (now 415 ILCS 5/1 
et seq.
 (West 1996)) and nui­sance had already been pre­pared, with the named defendants being the former owners, Moss-American and Kerr-McGee, along with the present owner, Lefton, but that such complaint would not be filed if the respon­sible parties volun­tarily accept­ed responsibility and undertook cleanup opera­tions.  

[Nonpublishable under Supreme Court Rule 23 omitted.]

Ultimately, on January 7, 1988, the State of Illinois filed a complaint (No. 88-CH-4) for preliminary and permanent injunc­tions against Moss-American, Kerr-McGee, Lefton Iron, and Lefton Land.  On January 21, 1988, Lefton's counsel sent a letter on behalf of Lefton Iron and Lefton Land to St. Paul, in which the defense of No. 88-CH-4 was tendered.  Lefton's counsel also demand­ed reimbursement for defense costs incurred to that date with respect to enforce­ment proceedings in conjunction with the complaint filed with the Board.  On February 10, 1988, St. Paul sent a letter to Lefton's counsel, declining coverage to both Lefton Iron and Lefton Land and denying a duty to defend.  A month later, Kerr-McGee entered into a consent decree that settled the State's suit against it.  Kerr-McGee agreed to undertake at its expense any and all remedi­al work necessary to protect the public health and the environ­ment.  Neither Lefton Iron nor Lefton Land took any part in the consent decree.  

In an attempt to make Lefton Iron and Lefton Land shoul­der at least some, if not all, of the costs of cleaning the site, Kerr-McGee filed suit on August 29, 1990, against Lefton Iron and Lefton Land under the Act.  See 42 U.S.C.A. §9601 
et seq.
 (West 1995).  Kerr-McGee made three specific claims against Lefton.  

[Nonpublishable under Supreme Court Rule 23 omitted.]

These claims were litigated in the United States District Court for the Southern District of Illinois.  The District Court agreed with Lefton and ruled against Kerr-McGee on all three counts.  Howev­er, the Seventh Circuit Court of Appeals reversed on all counts in favor of Kerr-McGee.  
Kerr-McGee Chemical Corp. v. Lefton Iron & Metal Co.
, 14 F.3d 321 (7th Cir. 1994).  Consequently, Lefton is responsible for all cleanup costs relating to the site. 

With regard to the instant case, St. Paul filed a complaint for declaratory judgment against Lefton on June 20, 1988.  Lefton filed its answer, affirmative defenses, and claims against St. Paul and the other insurers on January 6, 1992.  Lefton's claims sought a declaration that the insurance companies have duties under their respective policies to defend Lefton Iron and Lefton Land and to reimburse them for defense costs incurred in the defense litigation concerning the site.  On January 20, 1994, Lefton filed a motion for partial summary judgment, seeking a declaration that St. Paul was obligat­ed to defend Lefton in actions arising out of owner­ship of the site.  St. Paul filed its countermotion for summary judgment and a memorandum in support thereof.  The memorandum asserted, 
inter alia
, that the doctrine of collateral estoppel applies to this case pursuant to the holding in 
Kerr-McGee Chemical Corp. v. Lefton Iron & Metal Co, Inc.
, 14 F.3d 321, 328 (7th Cir. 1994).  

[Nonpublishable under Supreme Court Rule 23 omitted.]

Ultimately, the trial court held that no genuine issue of materi­al fact existed on the issues of known loss and St. Paul's pollu­tion exclusion.  

[Nonpublishable under Supreme Court Rule 23 omitted.]

Lefton filed a motion for reconsideration, arguing that the trial court misinterpreted the known-loss doctrine and the application of St. Paul's pollution exclusion.  Safety National, the excess carrier during the St. Paul policy years, joined with Lefton in these arguments.  In the alternative, Lefton requested that the issue be certified for interlocutory appeal.  Thereafter, the other insurers filed motions for summary judgment based upon the known-loss doctrine.  

[Nonpublishable under Supreme Court Rule 23 omitted.]

On December 7, 1995, the trial court heard arguments on Lefton's motion to reconsider, the motions for summary judgment, and the insurers' motions to strike affidavits.  The insurers pointed out that the Environmental Protection Act, which prohib­ited open dumping, had been enacted prior to Lefton's acquisi­tion of the property and that common law nuisance had existed in Illinois for 100 years or more.  Accord­ingly, the insurers argued they were all entitled to summary judgment under the known-loss doctrine.  The trial court found for the insurers, denied Lefton's motion to reconsid­er, and ordered the parties to propose a joint order.  That order was filed on January 19, 1996, and granted summary judgment in favor of all insurers but denied the motion to strike.  Lefton now appeals.  

II.  STANDARD TO BE APPLIED

In 
Outboard Marine Corp. v. Liberty Mutual Insur­ance Co.
, 154 Ill. 2d 90, 607 N.E.2d 1204 (1992), our supreme court set forth the standard of review in cases involving appeals from summary judgment rulings.  

"In appeals from summary judgment rulings, we conduct a 
de novo
 review.  (See 
Schmolke v. Highland Butterfield, Inc.
 (1984), 128 Ill. App. 3d 710, 712-13[, 471 N.E.2d 226, 229]; 
Fuller v. Justice
 (1983), 117 Ill. App. 3d 933, 938[, 453 N.E.2d 1133, 1136].)  Summary judgment is appropri­ate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  (
Purtill v. Hess
 (1986), 111 Ill. 2d 229, 240[, 489 N.E.2d 867, 871].)  Where a reasonable person could draw divergent inferences from undisputed facts, summary judgment should be denied.  
Pyne v. Witmer
 (1989), 129 Ill. 2d 351, 358[, 543  N.E.2d 1304, 1308]."  
Outboard Marine Corp.
, 154 Ill. 2d at 102, 607 N.E.2d at 1209.

With this in mind, we now begin an analysis of the issues presented.

III.  ISSUES

A.  KNOWN LOSS

Lefton contends that the trial court erroneously applied the known-loss doctrine in granting summary judgment in favor of the insurers.  The trial court found that the insurers had no duty to defend Lefton because the claims for which Lefton sought a defense were known to Lefton at the time it ac­quired the proper­ty in 1973.  Lefton insists that while it was aware of the presence of creosote at the site when it purchased the site in 1973, it was in no way aware of the extent of the contami­na­tion, specifi­cally, that the contamination would migrate into the groundwater.  Lefton asserts that rather than strictly constru­ing the evidence against the moving parties, the trial court relied on adverse infer­ences and drew assumptions against Lefton which are not supported by the evidence.  For example, Lefton points to the trial court's order in this case, which pro­vides that "Lefton contracted to purchase, at a dis­count, a polluted and polluting parcel of land."  Lefton argues that there is nothing in the record to indicate that Lefton purchased this land at a discount­ed price.  

The insurers first reply that the pur­chase agreement signed by Lefton in October 1972 shows conclu­sively that Lefton knew that the site was polluted with "waste water ponds contain­ing oil and other wood preservatives in solution" and that Lefton, thus, sustained a known loss as defined by our supreme court in 
Out­board Marine Corp. v. Liberty Mutual Insur­ance Co.
, 154 Ill. 2d 90, 607 N.E.2d 1204 (1992).  St. Paul and Safety National further assert that between the time Lefton purchased the land and the time their policies were issued to Lefton, the Illinois Environ­mental Protection Act (Ill. Rev. Stat. 1971, ch. 111½, par. 1001 
et seq.
 (now 415 ILCS 5/1 
et seq.
 (West 1996)) was effective and the Compre­hen­sive Envi­ron­men­tal Re­sponse Compensation and Liabil­ity Act of 1980 (42 U.S.C.A. §9601 
et seq.
 (West 1995)) was passed and Lefton, there­fore, was not only aware of the existence of Federal and State legisla­tion empowering the govern­ment to impose strict cleanup measures but also was aware that such cleanups were occur­ring nearby, as evidenced by a November 17, 1980, local newspaper article pro­duced by Lefton concerning a polluted site one-sixth mile away from the site in question.  These two insur­ers point out that on June 8, 1981, pursuant to the requirements of the Act, Kerr-McGee filed with the United States Environmental Protection Agency a "Notice of Hazardous Waste Site" with respect to the instant site.  Furthermore, in May 1983, a site inspection was conducted on behalf of the United States Environmen­tal Protection Agency, and on June 23, 1983, an assessment report of the site was filed with the agency.  Like­wise, National Union asserts that the trial court properly granted summary judgment in its favor because Lefton knew or had reason to know when the policy was issued on November 1, 1985, that there was a substantial probabil­ity that loss or liability would ensue due to creosote contamina­tion on the property.  

The purpose of insurance is to protect against misfortune by permitting one to whom the law assigns the risk of a particular loss to shift the burden to an institution better able to assume and manage that risk through diversification of cross-risk categories.  The presence of risk is the essence of an insurance contract.  Accordingly, where there is no risk of loss, as where a loss occurred prior to the policy taking effect, insurance ceases to serve its purpose of risk-spreading.  
United States Liability Insurance Co. v. Selman
, 70 F.3d 684, 690 (1st Cir. 1995).  The standard to be applied is:  "[I]f the insured knows or has reason to know, when it purchases a CGL [comprehensive general liability policy], that there is a substantial probabili­ty that it will suffer or has already suffered a loss, the risk ceases to be contingent and becomes a probable or known loss."  
Outboard Marine Corp.
, 154 Ill. 2d at 103, 607 N.E.2d at 1210.  

In 
Outboard Marine Corp.
, our supreme court specifically stated:

"There is no bright-line test to determine whether and at what point in time the insured knew or had reason to know of the substantial probability of the loss at issue.  The extent of the insured's knowledge of the loss must be deter­mined on a case-by-case basis.  In a motion for summa­ry judgment, the court must determine whether any factual questions exist with respect to the insured's knowledge at the time it bought each policy."  154 Ill. 2d at 104, 607 N.E.2d at 1210.  

In that case, the trial court determined that upon receipt of an administrative order from the Envi­ronmental Protection Agency in February 1976, the insured had knowledge as a matter of law that it would suffer a probable loss due to PCB contamination at the sites in question.  Accordingly, any policy issued to the insured after receipt of this administrative order would not provide coverage for this PCB contamination.  The insurers asserted on appeal that the PCB contamination constituted a known loss because the insured had knowledge that it was releas­ing waste material into the environment as early as 1959.  154 Ill. 2d at 104, 607 N.E.2d at 1210.  The insured, on the other hand, con­tended that it was only aware of the 
possibility
 that it may have been discharging pollutants and that it took steps to remedy any such problem so that a loss or liability would not arise.  Accordingly, the insured was aware only of a risk of liability prior to August 1976, when the Environmental Protection Agency sent the insured a letter actually confirming the pollu­tion.  154 Ill. 2d at 105-06, 607 N.E.2d at 1211.  After careful review, our su­preme court determined that the trial court proper­ly found as a matter of law that the February 19, 1976, adminis­trative order gave the insured knowledge of a substantial probability that the claims would be made against it for PCB contamination, that the trial court was correct to invoke the known-loss doc­trine as to the insurer whose policy did not commence until March 1976 and was correct to grant summary judgment in favor of this insurer, but that because disputed factual ques­tions existed con­cern­ing the insured's knowledge at the time it pur­chased earlier policies from other insurers, the trial court was correct to deny the other defendant insurers' motions for summary judg­ment.  154 Ill. 2d at 106, 607 N.E.2d at 1211.

The instant case is similar to 
Outboard Marine Corp.
 in that there are numerous contentions by various insurers as to what point in time Lefton knew or had reason to know of the 
substantial
 probability of the loss which occurred.  The trial court apparently believed that Lefton knew at the time it purchased the property that creosote and creosote waste polluted the property and underlying groundwater to the extent that millions of dollars worth of cleanup would be neces­sary in the coming years.  We find nothing in the record to support this finding as a matter of law.  Lefton Iron was in the scrap metal business, and there is little to support the theory that it knew the hazards of creosote and creosote waste when it purchased the property.  Had Lefton Iron known the implica­tions of such, it certainly would have not indemnified Kerr-McGee nor would it have transferred ownership to Lefton Land in 1984.  More­over, as previ­ous­ly stated, the Act upon which liabil­i­ty is predicated was not even passed by Con­gress until 1980.  It is much broader than the Illi­nois Environ­mental Protection Act or nui­sance law.  For example, the Act is a strict liability statute and makes Lefton liable even though Lefton did not cause the pollu­tion; it is retroactive, creating liability for pre-enactment conduct which was perfectly lawful at the time it was performed; and it creates joint and several liability, making any party, no matter how small its contribution to the problem, potentially liable for the entire cleanup cost.  See Roger A. Stetter, 
Response Strategies for Potential­ly Responsible Parties at Hazardous Waste Sites
, 37 La. B.J. 71, 72 (1989).  

After review­ing the numer­ous docu­ments, re­ports, and assessments that are made part of this record, we find that upon receipt of the Novem­ber 5, 1985, letter from the Attor­ney Gener­al's office, Lefton had knowledge as a matter of law that it would suffer a probable loss due to contamination at the site it purchased from Kerr-McGee in 1973.  That letter refers to a recent inves­tiga­tion con­ducted at the site.  This is the first time the results of the investi­ga­tion are made clear to Lefton.

[Nonpublishable under Supreme Court Rule 23 omitted.]

The letter goes on to state that a multicount complaint alleging numerous violations of the Illinois Environmental Protection Act and nuisance had already been prepared and would be filed unless the responsible parties, including Lefton, voluntarily accepted responsi­bility.  However, we believe that numerous factual questions exist concerning Lefton's knowledge of pollution on the site before its receipt of this letter.  The indem­nifica­tion provision cannot be construed to create a presumption that Lefton Iron knew or had reason to know of a 
substan­tial probabil­ity
 that loss or liability would ensue.  Because all policies in issue were purchased prior to the receipt of the above-referenced letter, we cannot summarily dismiss any of the insur­ers based on the known-loss doctrine, and we find that the trial court erred in doing so.   B.  POLLUTION EXCLUSION

Lefton next asserts that the trial court erred in entering summary judgment for St. Paul and Safety National on the basis of pollution-exclusion clauses because the chemical contamination alleged in the underlying complaints constitutes a "sudden accident involving pollution" within the exception to the pollu­tion-exclusion clause of St. Paul's and Safety National's poli­cies.  Lefton argues that the supreme court's decision in 
Out­board Marine Corp.
 gives guidance and supports Lefton's assertions that the term 
sudden
 is ambiguous and that it can mean either something happening unexpectedly, without notice or warning, or something happening abruptly, rapidly, or swiftly.  When a term in an insurance contract is ambiguous, it should be construed in favor of the insured, as it was in 
Outboard Marine Corp.
  Lefton and Safety National respond that the exclusionary language found in the instant contract is distinc­tive from the language found in 
Outboard Marine Corp.
 and that the term 
sudden
 within this context only has one meaning, namely, a temporal meaning.  The insurers insist that the policy is unambiguous and that the trial court did not err in this regard.  The St. Paul policy states, in pertinent part:

"Exclusions - Claims We Won't Cover

* * *

Pollution.  We won't cover injury or damage caused by the discharge, dispersal, release or escape of pollutants such as:

● smoke, vapor, soot or fumes;

● acids, alkalis, toxic chemicals, liquids or gases; or

● waste material or other irritants or contaminants.

But this exclusion won't apply to sudden accidents involving pollutants."  (Emphasis omitted.)

On the other hand, the pollution-exclusion clause construed by our supreme court in 
Outboard Marine Corp.
 provided, in pertinent part:

"`This insurance does not apply *** to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dis­persal, release or escape is 
sudden and accidental
."  (Em­phasis added.)  154 Ill. 2d at 118, 607 N.E.2d at 1217.

While these two exclusionary clauses are not identical, they are certainly similar.  

The 
Outboard Marine Corp.
 court explained that the term 
sudden
 has two defini­tions: 

"Numerous dictionaries define `sudden' as happening unexpectedly, without notice or warning, or unforeseen.  These same dictionaries also define `sudden' as abrupt, rapid, or swift.  (See, 
e.g.
, Webster's Third New Interna­tional Dictionary 2284 (1986); American Heritage Dictionary of the English Language 1286 (10th ed. 1981); Black's Law Dictionary 1432 (6th ed. 1990).)  Courts throughout the country are divided on the meaning of `sudden' within the instant context.  (Compare, 
e.g., United States Fidelity & Guaranty Co. v. Star Fire Coals, Inc.
 (6th Cir. 1988), 856 F.2d 31, 34 (`sudden' is unambiguous and is construed to mean `abrupt'); 
Lumbermens Mutual Casualty Co. v. Belleville Industries, Inc.
 (1990), 407 Mass. 675, 680-81, 555 N.E.2d 568, 572 (same); 
Upjohn Co. v. New Hampshire Insurance Co.
 (1991), 438 Mich. 197, 207, 476 N.W.2d 392, 397 (same); 
Waste Management of Carolinas, Inc. v. Peerless Insurance Co.
 (1986), 315 N.C. 688, 693, 340 S.E.2d 374, 381-83, with 
Hecla Mining Co. v. New Hampshire Insurance Co.
 (Colo. 1991), 811 P.2d 1083, 1091-92 (`sudden' is ambiguous and construed to mean unintended or unexpected); 
Claussen v. Aetna Casualty & Surety Co.
 (1989), 259 Ga. 333, 335, 380 S.E.2d 686, 688 (same); 
Broadwell Realty Services, Inc. v. Fidelity & Casualty Co.
 (1987), 218 N.J. Super. 516, 531-35, 528 A.2d 76, 83-86 (same); 
United Pacific Insurance Co. v. Van's Westlake Union, Inc.
 (1983), 34 Wash. App. 708, 714-15, 664 P.2d 1262, 1265 (same).)"  
Outboard Marine Corp.
, 154 Ill. 2d at 120-21, 607 N.E.2d at 1218.

We believe that these two definitions, when applied to the instant language, are both reasonable interpretations of the term "sudden" in the context in which it appears.  Here, 
sudden
 could mean either an unexpected accident or an abrupt accident. 

More­over, we agree with Lefton that the many disputes that have arisen over this issue and their treatment by the courts reflect an inherent ambiguity caused by the use of the word 
sudden
.  Accord­ingly, we find the term 
sudden
 used in this context to be ambiguous.  In Illinois, ambiguities are to be resolved in favor of the insured, especially those appearing in exclusionary clauses.  
Outboard Marine Corp.
, 154 Ill. 2d at 121, 607 N.E.2d at 1218.  The 
Outboard Marine Corp.
 court addressed this issue at length, and we need not repeat its reasoning here.  We find that the trial court erred in its construction of the term 
sudden
 in ruling in favor of St. Paul and Safety National on their motions for summary judgment on their duty to defend Lefton based on the pollution-exclusion provisions.

C.  COLLATERAL ESTOPPEL

Finally, we consid­er the insurers' conten­tion that Lefton is collaterally estopped from seeking relief from the trial court's order due to the opinion issued by the Seventh Circuit Court of Appeals in 
Kerr-McGee Chemical Corp. v. Lefton Iron & Metal Co.
, 14 F.3d 321 (7th Cir. 1994).  The insurers argue that the issue of whether Lefton was aware of pollution at the site or whether Lefton knew that it would likely be subject to legal liability for the pollution are issues which were fully adjudi­cated before the Seventh Circuit.  Lefton replies, first, that the insurers have procedurally waived this issue by failing to raise it before the trial court and, second, assuming, 
arguen­do
, that the issue is not procedurally waived, it is factually not available because the issue decided by the Seventh Circuit is not identical to the one presented here.  

The purpose of collateral estoppel, also known as issue preclusion, is to prevent repetitive litigation of the same factual issue.  Collateral estoppel applies when a party partici­pates in two separate and consecutive cases arising out of different causes of action and some controlling factor or ques­tion material to the determination of both cases has been adjudi­cated against the party in the former suit by a court of compe­tent jurisdiction.  
Stathis v. First Arlington National Bank
, 226 Ill. App. 3d 47, 53, 589 N.E.2d 625, 630 (1992).  Utilization of collateral estoppel requires that (1) the issues be identi­cal, (2) there be a final judgment on the merits, and (3) the party against whom an estoppel is asserted is a party or in privity with a party to the prior adjudication.  
Illinois State Chamber of Commerce v. Pollution Control Board
, 78 Ill. 2d 1, 7, 398 N.E.2d 9, 12 (1979).  The party asserting the preclusion bears the heavy burden of showing with clarity and certainty that the identical issue was decided in the prior case.  
S. & S. Automotive v. Checker Taxi Co.
, 166 Ill. App. 3d 6, 8, 520 N.E.2d 929, 931 (1988); 
Benton v. Smith
, 157 Ill. App. 3d 847, 853, 510 N.E.2d 952, 956 (1987).

First, we disagree with Lefton that the issue of collat­eral estoppel is not procedurally before us because the insurers failed to raise it at the trial level.  Assuming, 
arguendo
, that the three requirements of collateral estoppel previously set forth were present here, we would find the present action barred in order to promote judicial economy.  Second, we find that the legal issue presented here is not identical to the issue decided in 
Kerr-McGee Chemical Corp. v. Lefton Iron & Metal Co.
, 14 F.3d 321 (7th Cir. 1994).  In that case, the Seventh Circuit found as follows:

"Lefton knew of the pollution at the site when it purchased the property; its inspection of the site revealed signs of pollution; soil samples indicated the presence of creosote; and most importantly, in the contract of sale Lefton ex­pressly acknowledged the presence of wood preservatives (of which creosote is one) on the property ***."  
Kerr-McGee Chemical Corp.
, 14 F.3d at 328.

The Seventh Circuit found the indemnification provision to be of primary significance.  For purposes of this appeal, however, we do not believe that because Lefton expressly ac­knowl­edged the presence of wood preservatives on the property and expressly agreed to assume all costs of claims pertaining to pollution from Kerr-McGee, it can be said that Lefton knew the extent of the pollution at the site or that they would have to pay for the removal of pollution pursuant to the passage of the Act in 1980.  Even the Seventh Circuit acknowledged in 
Kerr-McGee Chemical Corp.
 that "Lefton might not have foreseen that these chemicals would one day need to be removed at a substantial price."  14 F.3d at 328.  The Seventh Circuit applied contract principles and found that since Lefton contrac­tually agreed to indemnify Kerr-McGee against any and all claims, the question of fault was irrelevant, as was the lack of foresee­ability of the extent of the pollution.  14 F.3d at 328.  We cannot equate knowl­edge of the exis­tence of an undetermi­ned amount of wood preser­vatives on the site with knowledge of a substantial probabil­ity that claims or liability would be at­tached to Lefton via a Federal statute which took effect in 1980.  See 42 U.S.C.A. §9601 
et seq
. (West 1995).  It is well settled that two causes of action are not necessarily the same just because they arise out of the same set of facts.  
Benton v. Smith
, 157 Ill. App. 3d 847, 855, 510 N.E.2d 952, 957.  We find that collateral estoppel does not bar the present action.  

SUMMARY

For the foregoing reasons, we reverse and remand to the circuit court of St. Clair County to resolve the factual issues surrounding the level of Lefton's knowledge at relevant times and to determine whether known-loss principles apply to any carri­ers.  The relevant question on remand, as provided for by our supreme court in 
Outboard Marine Corp.
, is when Lefton knew or had reason to know that a probable loss or liability would occur due to the creosote contamination alleged in the underlying complaints.  
Outboard Marine Corp.
, 154 Ill. 2d at 107, 607 N.E.2d at 1212.

Reversed and remanded with directions.

CHAPMAN and KUEHN, JJ., concur.