No. 3--04--0982

Filed April 28, 2006

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2006

| | | |
|---|---|---|
| HOMEWARD BOUND SERVICES, INC., | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit Peoria County, Illinois |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | |
| THE ILLINOIS DEPARTMENT OF INSURANCE, J. ANTHONY CLARK, DIEDRE K. MANNA, KIRKWOOD INSURANCE SERVICE COMPANY, STEPHEN M. DURAN, and STEPHEN NAVE, | ) ) ) ) ) ) ) | No. 04--MR--161<br><br><br><br><br>Honorable<br>John Barra |
| Defendants-Appellees. | ) | Judge, Presiding |

JUSTICE HOLDRIDGE delivered the Opinion of the court:

The Illinois Department of Insurance (Department) determined that Homeward Bound Services, Inc., was conducting insurance business and was thus subject to the Illinois Insurance Code (Code) (215 ILCS 5/121 et seq. (West 2002)). Since Homeward Bound did not have the requisite insurance certificate, the Department issued a cease and desist order. Homeward Bound sought review, and the Peoria County circuit court upheld the Department's determination. Homeward Bound then filed this appeal. We affirm.

BACKGROUND

Homeward Bound operates as "The Nursing Home Alternative" for elderly persons, providing in-home assistance with bathing, dressing, toileting, and other daily tasks. The contract between Homeward Bound and its customers is styled, "Assisted Living Service Agreement" (ALSA). The standard ALSA lasts one year and excludes coverage for medical treatment or hospital care. Persons who are currently hospitalized, residing in a nursing home, or terminally ill are not eligible for Homeward Bound's services.

The ALSA has a fee structure based partly on each customer's medical history for the previous three years. Customers are placed in one of four classifications: Preferred (for those with the least serious problems), Class 1, Class 2, and Class 3 (for those with the most serious problems). A customer's fee is determined by their classification and age. Each ALSA includes a six- or twelve-month waiting period during which the customer cannot receive services for a health problem that existed at the time of contracting. The ALSA describes this waiting period as "[a] cost containment measure *** that applies to all customers who have current needs or who may need services for a current condition." The length of the waiting period depends partly on the customer's classification.

When a customer seeks assistance under his or her ALSA, they must first create a "Plan of Service" with a local home care agency and Homeward Bound. This procedure is designed to ensure that the required waiting period has been met, and that Homeward Bound is contractually obligated to provide the type of assistance sought.

The Department determined that Homeward Bound was selling insurance without the requisite certificate of authority. Accordingly, on May 22, 2003, the Department issued a cease and desist letter to Homeward Bound, ordering it to discontinue its operations in Illinois. The matter proceeded to an evidentiary hearing before an administrative law judge. The evidence presented at the hearing included the following.

Linda Crowder (a Department staff examiner) stated that Homeward Bound had, on at least one occasion, refused to return a customer's payments even though the customer had not received any assistance. Charles Budinger (a Department supervisor) stated that the term "insurance" means an arrangement involving reimbursement to an individual for expenses incurred, where benefits are guaranteed to someone for less than the market price. James Peacock (another Department supervisor) testified that Homeward Bound's product was in the form of long term health care insurance. Regarding the requisite element of risk, he explained that customers could purchase an ALSA in advance of an injury as security against the possibility of the injury happening. Peacock also explained that the State of Washington had instructed Homeward Bound to change its ALSA, and that after the change Washington found that the product was not insurance.

Shannon Whalen (a Department actuarial examiner) testified that Homeward Bound's business involves a transfer of risk because customers who face the possibility of needing future care transfer the economic risk of that possibility by purchasing an ALSA. She also testified that Homeward Bound spreads the transferred risk by signing up multiple customers from whom fees are collected under a graduated schedule. A customer's rate is directly proportionate to the likelihood that he or she will use the

3

service.  Furthermore, Whalen illustrated that the price of an ALSA is considerably discounted from the market value of the services specified in the contract.  In at least one instance, for example, a customer paid $5,650 for a contract covering $43,200 worth of services.  Whalen attributed such discounting to actuarial estimations regarding the probability of usage.  She explained that customers normally do not use all the services specified in their contracts.  Finally, Whalen testified that Homeward Bound's product involves a contingency to be satisfied before services are rendered.  To illustrate the contingency, she pointed to three factors: repeated reference in the marketing materials to an "incident" as a trigger or a catalyst; the prerequisite of a meeting to draw up a Plan of Service; and the mandatory waiting period exclusion for conditions that existed at the time of contracting.

Hiram Torres (a Homeward Bound executive) testified that the mandatory waiting period is a cost containment measure, and that during the period a customer can receive services for a new illness or injury but not a preexisting condition.  When asked why ALSA fees are considerably discounted from the market value of the services specified in the contract, Torres did not give a clear explanation.  He did, however, explain what would happen if every customer actually used all the services they purchased: "Obviously we'd be out of business."  Torres noted that the language of the ALSA was modified in 2001 at the recommendation of an outside expert.  The modifications, according to Torres, were merely for "verbiage" and did not change the actual program.

Under a section entitled "What is Covered," the prior version of the ALSA read:

4

"In consideration of the price paid by the subscriber, Homeward Bound

Services Inc. shall provide services A thru G up to the term of the daily

home service schedule subscriber is under a "Plan of Care" <u>for an illness</u>

<u>or injury, received medical care, advice or treatment by a doctor, hospital</u>

<u>or therapist for any medical condition diagnosed or first treated after the</u>

<u>application date</u>."  (Emphasis added.)

In the modified version of the ALSA, the word "subscriber" is replaced with "customer,"

and the above-emphasized language is omitted.

Evidence was also presented regarding Homeward Bound's marketing materials.

Those materials juxtaposes the benefits of receiving care at home with the drawbacks

of residing in a nursing home.  The ALSA is advertised as "[taking] the place of a long

term care insurance policy."  Homeward Bound markets its product as "NOT insurance

but a pre-need program."  According to one brochure:

"The Assisted Living Service Agreement is a PRE-NEED service contract.

It is designed to provide service for any new illness or injury occurring

after the date of application that is unrelated to a prior condition.  After the

waiting period services are provided during episodes of illness or injury

even if related to a prior condition. ***

***

THOSE INDIVIDUALS WITH IMMEDIATE NEED FOR HELP AT HOME

ARE ENCOURAGED TO SEEK OTHER OPTIONS OR ENGAGE

HOMEWARD BOUND SERVICES, INC. ON A PRIVATE PAY BASIS."

Homeward Bound encourages potential customers: "BE PREPARED, Protect Yourself."

5

On March 19, 2004, the administrative law judge issued a recommendation that Homeward Bound's product constitutes insurance, thus subjecting it to the requirements of the Code. The Department decided likewise and entered a permanent injunction against Homeward Bound's uncertified insurance business. The Peoria County circuit court upheld the Department's decision, and this appeal followed.

## DISCUSSION

From the outset, we note that despite certain waiver arguments by the Department, we have elected to address Homeward Bound's claims on their merits. See Cathedral Rock of Granite City, Inc. v. Illinois Health Facilities Planning Board, 308 Ill. App. 3d 529, 545 (1999) ("[e]ven if [plaintiff] did not adequately raise the issues, forfeiture is not a limitation on this court's right to entertain an argument").

### 1. Department Rule

The Department's decision utilized the common law definition of insurance articulated in Griffin Systems, Inc. v. Washburn, 153 Ill. App. 3d 113 (1987). In Griffin Systems, the Court gave a four-pronged definition:

"(1) a contract or agreement between an insurer and an insured which exists for a specific period of time; (2) an insurable interest *** possessed by the insured; (3) consideration in the form of a premium paid by the insured to the insurer; and (4) the assumption of risk by the insurer whereby the insurer agrees to indemnify the insured for potential pecuniary loss to the insured's property resulting from certain specified perils." Griffin Systems, 153 Ill App. 3d at 116.

6

Homeward Bound claims the Department erred because it had no administrative rule outlining a definition of insurance.

Section 5--10 of the Illinois Administrative Procedure Act reads:

"(a) In addition to other rulemaking requirements imposed by law, each agency shall (I) adopt rules of practice setting forth the nature and requirements of all formal hearings and (ii) make available for public inspection all rules adopted by the agency in the discharge of its functions.

***

(c) No agency rule is valid or effective against any person or party, nor may it be invoked by the agency for any purpose, until it has been made available for public inspection and filed with the Secretary of State as required by this Act." 5 ILCS 100/5-10(a), (c) (West 2002).

In light of these requirements, Homeward Bound argues that the Department applied an improperly promulgated rule when it used the common law definition of insurance. We disagree.

"[N]ot all statements of agency policy must be announced by means of published rules. When an administrative agency interprets statutory language as it applies to a particular set of facts, adjudicated cases are a proper alternative method of announcing agency policies." Kaufman Grain Co. v. Director of the Department of Agriculture, 179 Ill. App. 3d 1040, 1047 (1988). The Griffin Systems court observed that, although there is no statutory definition of insurance, there is a common law definition dating as far back as 1897. The Griffin Systems court also noted that the Department of Insurance had applied the common law definition in reaching its decision. The court even

7

articulated the definition through a clear four-pronged standard. That standard has been on the books for nearly two decades. Accordingly, we are convinced that the standard was properly announced prior to the instant matter.

Homeward Bound's reliance on Kaufman Grain is misplaced. The Kaufman Grain court ultimately did find that an agency (Department of Agriculture) applied an improperly promulgated rule; but the rule at issue was fundamental, going to the question of the agency's authority to adjudicate a particular type of dispute in the first place. The court observed:

"None of the statutes *** clearly inform the public [that] the Department adjudicates disputes such as this. *** Furthermore, the public is provided with no information concerning the procedural rules which apply to proceedings before the Department involving such disputes. The Department adjudicating a broad category of disputes without having properly adopted a single administrative rule relevant to such proceedings is obviously a quite different type of situation from an administrative agency interpreting statutory language as it applies to specific facts." Kaufman Grain, 179 Ill. App. 3d at 1047.

The instant case involves a different scenario. Here, the Department unquestionably has authority to adjudicate disputes regarding whether given activities fall under the ambit of the Insurance Code. See 215 ILCS 5/121, 401 (West 2002). Moreover, there is no question that general procedural rules have been promulgated for governing such adjudications. The instant claim does not involve the Department's subject matter jurisdiction or its procedural rules for adjudicating disputes. The claim

8

simply involves the meaning of a statutory term as applied to a specific set of facts. As noted in Kaufman Grain, the common law is an acceptable means of providing such definitions. We see no reversible error.

## 2. Vagueness

Next, Homeward Bound claims the Code is void for vagueness because (without a definition of insurance) it gives ordinary persons no notice of what conduct is forbidden, and it leaves the director of the Department essentially free to determine the limits of his own authority.

All statutes are presumed to be constitutional (In re Estate of Jolliff, 199 Ill. 2d 510 (2002)), and the challenging party bears the burden of clearly rebutting this presumption (Miller v. Rosenberg, 196 Ill. 2d 50 (2001)). Moreover, a court must construe a statute in a manner upholding its constitutionality if such construction is reasonably possible. People v. World Church of the Creator, 198 Ill. 2d 115 (2001). A statute is void for vagueness only if its terms are so ill-defined that its meaning ultimately rests on opinions and whims rather than objective criteria and facts. Stern v. Norwest Mortgage, Inc., 179 Ill. 2d 160 (1997) (noting that a statute is not unconstitutionally vague merely because it might be susceptible of misapplication).

We note, consistent with our conclusion on the foregoing issue, that the legislature is not constitutionally required to define each term used in a statute. O'Connor v. A & P Enterprises, 81 Ill. 2d 260 (1980). Neither is the legislature required to establish criteria anticipating each detail necessary to enforce a law. Department of Transportation v. First Galesburg National Bank and Trust Co., 141 Ill. 2d 462 (1990). In prior instances, the Illinois Supreme Court has upheld statutes against vagueness

challenges even though statutory definitions were lacking for certain operative terms. See, e.g., Stein v. Howlett, 52 Ill. 2d 570 (1972); Polyvend Inc. v. Puckorius, 77 Ill. 2d 287 (1979); and Chastek v. Anderson, 83 Ill. 2d 502 (1981). In these cases, the terms at issue were common within their respective industries. Moreover, it was noted that statutes need sufficient flexibility to encompass the variety of unpredictable scenarios warranting regulation.

All of these principles warrant a finding that the Code is not void for vagueness. The word "insurance" is common in itself, and the Griffin Systems decision served to clarify the common understanding of what constitutes insurance business. In light of its need for flexibility in regulating these matters, the legislature was not required to go farther and pin down additional particulars. There is no reversible error.

This conclusion also governs Homeward Bound's claim that, due to the Code's alleged vagueness, it constitutes an improper delegation of legislative authority to the director of the Department. Moreover, every final decision issued by the director is subject to judicial review. This fact generally satisfies the separation of powers requirement. See City of Waukegan v. Pollution Control Board, 57 Ill. 2d 170 (1974).

### 3. Director's Decision

Next, Homeward Bound claims the Department erred in concluding that its activities constitute insurance business, thus subjecting it to the requirements of the Code. Since the Department applied historical facts to determine whether a legal standard was satisfied, the clearly erroneous standard of review applies. See AFM Messenger Service, Inc. v. Department of Employment Security, 198 Ill. 2d 380 (2001); The City of Belvidere v. Illinois State Labor Relations Board, 181 Ill. 2d 191 (1998). This

10

standard falls between the manifest weight and de novo standards, requiring some deference to the administrative agency's experience and expertise. Randolph Street Gallery v. Zehnder, 315 Ill. App. 3d 1060 (2000) (noting that the agency's decision should be upheld unless we are firmly convinced that it was mistaken).

Section 121 of the Code provides: "It shall be unlawful for any company to enter into a contract of insurance as an insurer or to transact insurance business in this State, without a certificate of authority from the Director [of the Department]." 215 ILCS 5/121 (2002). In applying this statute, as noted above, the Department used the following definition of insurance:

> "(1) a contract or agreement between an insurer and an insured which
> exists for a specific period of time; (2) an insurable interest *** possessed
> by the insured; (3) consideration in the form of a premium paid by the
> insured to the insurer; and (4) the assumption of risk by the insurer
> whereby the insurer agrees to indemnify the insured for potential
> pecuniary loss to the insured's property resulting from certain specified
> perils." Griffin Systems, 153 Ill App. 3d at 116.

The Department found, and we agree, that Homeward Bound's ALSA clearly satisfies the first three elements of this definition. Each contract has a specified ending date, each customer pays a specified amount under their contract, and each customer thereby acquires an interest in the care prescribed in the contract.

The fourth element is the crux of this case. Cf. St. Paul Fire and Marine Insurance Co. v. Lefton Iron and Metal Co., 296 Ill. App. 3d 475 (1998) (noting that risk is the essence of an insurance contract). Did the Department clearly err in finding that

11

Homeward Bound's business involves assuming risk through an agreement to indemnify customers for potential pecuniary loss?  We conclude that no such error occurred.

Homeward Bound's written materials state that its product is not insurance. However, the following observation is apt:

> "[I]t is immaterial, or at least not controlling, that the term 'insurance' nowhere appears in the contract the nature of which is to be determined; indeed, the fact that it states that it is not an insurance policy is not conclusive, and a company may be found to be engaged in an insurance business even though it expressly disclaims any intention to sell insurance. Neither are the terms or mode of payment of the consideration determinative of the question whether the contract is one of insurance. The nature of a contract as one of insurance depends upon its contents and the true character of the contract actually entered into or issued--that is, whether a contract is one of insurance is to be determined by a consideration of the real character of the promise or of the act to be performed, and by a consideration of the exact nature of the agreement in the light of the occurrence, contingency, or circumstances under which the performance becomes requisite, and not by what it is called.  43 Am. Jur. 2d Insurance §4 (1982).

Accordingly, we look to the nature of the arrangement between Homeward Bound and its customers.

The evidence supports a finding that Homeward Bound targets elderly persons and offers its product as security against future problems that might otherwise require

12

nursing home care.  This is why the marketing materials urge, "BE PREPARED, Protect Yourself."  The ALSA is offered as protection against potential future events. Homeward Bound's own label of "PRE-NEED service contract" is consistent with this observation.  The written materials create a distinct impression of customers purchasing an interest in home-based care as security against the possibility of someday needing such care.

The effect of the mandatory waiting period is also instructive.  Since a customer cannot receive care during the waiting period for any reason that existed at the time of contracting, some new reason (a contingency) must occur before the ALSA becomes operative.  Thus, Homeward Bound has purported to shift risk in a contingent manner. This is the essence of insurance.  In Homeward Bound's own words: "The Assisted Living Service Agreement is *** designed to provide service for any new illness or injury occurring after the date of application that is unrelated to a prior condition."  Indeed the former version of the standard ALSA included this type of contingent language. Although such language has now been omitted from the ALSA, it still appears in the marketing materials, and Hiram Torres testified that no change has occurred in the actual program.

Neither are we persuaded by the fact that "[a]fter the waiting period services are provided during episodes of illness or injury even if related to a prior condition."  First, this language still implies that something will go wrong with a customer (illness or injury) before the ALSA applies.  Second, no post-waiting-period scenario can change the fact that during the waiting period a contingency is required.  Even if a contract only

13

amounts to insurance part of the time, that part still matters. Moreover, it appears that in some instances the waiting period extends through the entire term of an ALSA.

Homeward Bound argues that customers can obtain care simply by requesting it, thus suggesting that the only contingency is personal desire. However, the Department heard evidence that customers normally do not receive all the care specified in their plans. The Department also heard evidence that Homeward Bound substantially discounts its services compared to market value. As Hiram Torres explained, the company would "be out of business" if everyone used the services they purchased. These facts, combined with the contingent nature in which the program is marketed, are sufficient to support the Department's decision. We cannot say that the decision was clearly erroneous.

## 4. Due Process

Finally, Homeward Bound claims the Department violated procedural due process requirements by issuing a cease and desist order before conducting a hearing. This claim actually comprises a separate count of Homeward Bound's complaint and is still pending in the circuit court. As such, the claim is not properly before us at this time. Insofar as concerns of procedural fairness impact the claims that are properly before us, we have duly considered such concerns in reaching the above-stated conclusions.

## CONCLUSION

For the foregoing reasons, the judgment of the Peoria County circuit court (upholding the Department's decision) is affirmed.

Affirmed.

SLATER and O'BRIEN, JJ., concur.